392 P.2d 183

**Wesley WARD, Robert Ward and Chester Bullers, Plaintiffs-Respondents,**

**v.**

**Garnet KIDD, Defendant-Appellant.**

**Nos. 9337, 9346.**

Supreme Court of Idaho.

May 5, 1964.

James Annest, Burley, for appellant.

Herman E. Bedke, Burley, for respond-ents.

TAYLOR, Justice.

On June 25, 1959, the defendant (appel-lant) constructed a dam in the channel of Granite creek, upon land owned by him, to wit: the South half of Section 36, Township 16 South, Range 23 E.B.M., in Cassia county. This dam was located up-stream from the diversion works and ditch of plaintiff (respondent) Bullers. Defend-ant's avowed purpose in constructing the dam was to impound water for the use of livestock grazing upon his land, late in the season when the flow of the creek might not be sufficient for that purpose. The dam was constructed by means of a cater-pillar tractor with attached blade. A basin was scooped out on the upper side, the soil removed being pushed up to form the dam, which when completed was approximately eleven feet high. A ditch or spillway was constructed around one end of the dam to carry the overflow back to the channel of the creek below.

Plaintiffs (respondents), claiming prior rights in the flow of the creek, on June 30, 1959, went upon defendant's premises

and by means of a caterpillar tractor with blade, opened the dam down to the level of the creek bed and permitted most of the impounded water to flow down its natural channel. A small pond remained in the area scooped out in construction of the dam. Plaintiffs thereafter brought this action and procured a judgment dated December 20, 1962, establishing their respective prior rights and enjoining defendant "from in any way interfering with or obstructing the flow of Granite Creek * * * above Bullers' point of diversion that will impede, restrict or interfere with the water rights of the plaintiffs."

Defendant reconstructed the dam about the middle of June, 1961, after obtaining a permit from the state reclamation engineer authorizing the construction of such a dam for stock water purposes, to store and appropriate "public waters of the state." This second dam was destroyed sometime in November, 1962. December 20, 1962, defendant again reconstructed the dam.

He testified in the contempt proceeding, which was commenced against him in February, 1963, that at the time he reconstructed the dam on December 20, 1962, he was not aware that the judgment dated December 20, 1962, had been rendered, although he knew the judge had issued a memorandum opinion announcing that he would enter findings and judgment against defendant and in favor of the plaintiffs.

Defendant further testified that he first learned on December 27, 1962, that the judgment had been entered, and that thereafter he had not removed the dam, and that he would not remove it unless he was ordered to do so.

At the conclusion of the hearing in the contempt proceeding the district judge announced that he could not hold defendant in contempt for having reconstructed the dam on December 20, 1962, in view of his testimony that he was unaware of the judgment of that date, but did find him in contempt of court for having failed to remove the dam and the obstruction thereby created. By order dated March 19, 1963, the court found defendant in contempt "in that the said defendant placed a dam in Granite Creek and maintained the same in such a manner as to interfere with the flow of Granite Creek and the water rights of the plaintiffs." By its order the court imposed a fine of $500.00, and the additional sum of $50.00 for each day the obstruction remained in the channel of the creek after March 22, 1963, and provided that the defendant could purge himself of such contempt, and fine, by paying $250.00 as attorney's fees and costs to the plaintiffs, and removing the dam and obstruction on or before March 22, 1963.

Defendant appealed from the judgment and brought proceedings in this court for

review of the contempt proceeding and the judgment therein. Review was granted and the two causes were consolidated in this court for hearing and disposition.

The plaintiffs Wesley Ward and Robert Ward were the beneficial owners, under a contract to purchase, of the North half of Section 36, bordering defendant's property on the north. Plaintiff Chester Bullers was the owner of property lying north and east of Section 36, in Sections 30, 31 and 32. All of the property of the parties concerned herein was located in Township 16 South, Range 23 E.B.M. Plaintiff Bullers also owned State of Idaho license and certificate of water right No. 19283 issued by the state reclamation engineer February 26, 1945, confirming his right with priority of May 31, 1942, to the use of 1.44 cu. feet per second of the water of Granite creek for the purpose of irrigation upon the land referred to. Bullers' predecessor had constructed a diversion dam in the channel of Granite creek upon the land subsequently purchased by the defendant, and a short distance below the point where defendant constructed his dam, and also a ditch which led from the point of diversion to the Bullers' land, a distance of more than one-half mile. Mr. Bullers did not know the date the ditch was constructed, but testified he had been using it, and had been irrigating portions of his lands with water conveyed through it, for 18 or 20 years. He had also used the water conveyed by the ditch to his premises for stock watering purposes.

The North half of Section 36 had been purchased by Wards' predecessors about 1950 and Wards acquired it in 1958; they and their predecessors had used the land for grazing sheep or cattle each year subsequent to 1950.

Defendant does not challenge Bullers' water right. He contends that the Wards have acquired no right in the water of Granite creek, since they were not riparian proprietors, and could not obtain a right by watering their livestock from Bullers' ditch. Defendant asserts that his purpose, and his lawful right, in constructing the dam and reservoir was to impound public unappropriated water; that is, winter flow, early spring runoff, and low water when the flow of the creek was insufficient to reach Bullers' place of use; and that the dam as constructed did not interfere with Bullers' water right. He also claims to have developed new water in the course of construction, in that a seepage flow was uncovered by the bulldozer in scooping out the basin above the dam.

The court found that Granite creek is fed by melting snow, rain and small springs upon lands above defendant's property; that in early spring the creek flow increases, reaching its peak usually in May, and by the first of July the stream starts to recede in the daytime, but the flow returns during

the nighttime; that in some years the flow of the creek dries up to a point just above the location of defendant's dam, except when summer rains increase "the flow so that the same can be, and is, put to a beneficial use on the lands of the plaintiff Bullers"; that in the fall the flow increases and at times reaches Bullers' lands and is there applied to beneficial use during the winter months; that Bullers' diversion works were of a permanent nature and so constructed as to divert all of the flow of the creek, up to the capacity of the ditch, "the year round and had continued in such manner for more than 10 years"; "That the plaintiffs, Ward, and their predecessors in interest, for more than 5 years had watered livestock from the Bullers' ditch in the Wards' field when there was sufficient water in Granite Creek to reach Wards' fields."

The court further found:

"6. That on or about the 25th of June, 1959, defendant constructed in the channel of Granite Creek on his premises and upstream from the Bullers' point of diversion, a dam and reservoir in such a manner that the same would obstruct the flow of Granite Creek at the time of construction and at all other times subsequent thereto.

"7. That at the time the said reservoir and dam, which was approximately eleven (11) feet high, were con-

structed by the defendant, water was flowing in the main channel down to the diversion ditch of the plaintiff, Bullers, approximately 350 yards below the dam and from that point, at least during the night time, the water flowed in the diversion ditch through the field owned by Wards to the land of the plaintiff, Chester Bullers; and in the heat of the day a lesser amount of water flowed below the Bullers' point of diversion, and the defendant, Kidd, by the construction of the dam impounded all of the water that was then flowing in Granite Creek thereby depriving the plaintiffs, Ward and Bullers of all of the said water."

"9. That the defendant, Kidd, in the construction of the dam and reservoir did not develop any new water but the water uncovered was actually a seep and part of the water flow of Granite Creek."

That plaintiffs' removal of the obstruction occasioned by defendant's dam caused defendant no damage; that the removal cost plaintiffs $20.00;

"13. That the acts of the defendant, Kidd, in building the dam was intentional, unlawful, malicious and without the consent and approval of plaintiffs thereby giving the plaintiffs right to punitive damages in the sum of $1.00."

From the foregoing facts the court concluded:

"1. That the plaintiff, Bullers, is entitled to the year round unobstructed flow of Granite Creek for irrigation and domestic purposes up to 1.44 cubic feet per second which said water is appurtenant to the [Bullers' land]. * * *

"2. That the plaintiffs, Ward, have acquired and now own a right to have the water proceed through the diversion ditch through their field, above described, for domestic use of watering livestock to the extent of Bullers' appropriation and water license.

"3. That the defendant, Kidd, has no right to impound, or in any manner obstruct the flow of Granite Creek that will interfere with the flow of 1.44 cubic feet of water with priority date of May 31, 1942.

"4. That the plaintiffs are entitled to a judgment against the defendant for the sum of $20.00 actual damages and $1.00 punitive damages, and costs.

"5. That plaintiffs are entitled to a judgment for a permanent injunction restraining the defendant from in any way interfering with or obstructing the flow of water in Granite Creek and to the water rights of plaintiffs."

The judgment of December 20, 1962, was entered accordingly.

By appropriate assignments of error defendant raises the issue of the sufficiency of the evidence to support the findings and conclusions.

There was direct conflict between the witnesses for the respective parties as to whether the water in the creek had receded and ceased to flow at the point where defendant's dam was built at the time it was constructed on June 25, 1959. Robert Ward testified that 10 to 15 inches of water was running through the ditch and into Bullers' premises on June 16, 1959, during the hot part of the afternoon (when flow at that season normally recedes); that he observed the ditch twice between the 16th of June and the time the dam was put in, and on each occasion water was flowing in the ditch. Both Robert and Wesley Ward testified that the ditch was wet but no water was flowing in it on June 26th; they then discovered the dam and observed that 20 or more inches of water was flowing into the reservoir above it; that rain storms occurred after the dam had been opened, which gave rise to a flow of water through the ditch; and that they used water from the ditch for their livestock each year of their ownership of the N½ of Section 36 and prior thereto when they leased from their predecessor Floyd Knight.

Knight testified he grazed cattle on the N½ of Section 36 and used water from the ditch for his cattle each of 5 years, 1954

through 1958; that there was water flowing in the ditch as late as the last of August in some years; that in periods of late rains he had seen water flowing in the ditch in September; that he had seen Bullers irrigating in late summer; that after the early season runoff had ceased there was more flow in the ditch in the morning and less in the evening; that he turned his cattle out on the N½ of Section 36 between the first and 20th of June each year, and that for stock watering purposes there was water flowing in the ditch from thirty days to two months "according to the year" after the cattle were turned out; that in 1958 an early fall of snow melted and water came down the ditch in November; and that he had never seen water flow in the ditch throughout any summer; that it always ceased to flow at sometime during each summer.

Chester Bullers testified that he irrigated the year around whenever there was water in the ditch that would flow upon his land; that when not actively irrigating alfalfa he had settings upon his meadow hay land by which he changed the stream from one portion to another; that whenever water came down the ditch it was used to irrigate the meadow hay; that in 1958 he was still irrigating alfalfa in the forepart of August; that some years there was more water than others; that 1950 was a good year and he had "irrigating water" in the forepart of August; that he estimated the flow in the ditch on the 15th of June, 1959, at 20 inches

in the afternoon and more than that in the morning; that he saw Robert Ward water his sheep from the ditch just outside his (Bullers) fence on June 16, 1950; that on June 22nd he estimated 15 to 20 inches of water flowed onto his premises through the ditch; that after the spring flow, there was more water in the ditch in the mornings than in the late afternoon; and that after the dam was opened on June 30, 1959, rains occurred for about a week or ten days, causing water to flow through the ditch to his premises.

He further testified there were seeps and springs below his diversion from which there was plenty of water to fill a stock-watering pond; that he asked Kidd why he had not constructed his dam below the Bullers diversion, and that Kidd answered:

"A He said he put the dam where he pleased on his own property. He could do as he pleased on his own property."

On cross-examination Bullers testified that he irrigated hay land continuously from sometime in March until the 25th of June in 1950; that he did not remember a year when the water had ceased to flow in the ditch on June 29th before the year 1959; that water flowed in the ditch at night after July 7th and up to July 14, 1959, "and about the 14th it ceased to reach at all" unless rain occurred; referring to the year 1959, "that was one of the driest years we

ever had, and if I recollect, there had been a couple or three more years that it was pretty dry. But the most of the time, most years, the water would last up—I have irrigated many a time in July, up to the 1st of August," and

"Q Well, Mr. Bullers, isn't it a fact that in each year there does come a time when the water ceases to flow either in the early morning or in the day time?

"A Sometimes in some months. Sometimes September is the worst month, sometimes it is October, depending on how much snow. Sometimes you have snow storms and rain storms in September and the water is back down in the field again. Usually it's done that a lot of times."

Fred Bullers, son of plaintiff Chester Bullers, testified that water was flowing onto his father's meadow hay land on June 22, 1959; that water was applied to irrigation in September of 1950; that 1959 was a dry year; and that July 14, 1959, was the earliest date he could remember, when the water ceased to reach his father's premises, in any year.

Witnesses for the defendant testified that there was no water flowing in the channel of Granite creek at the time and place where defendant Kidd constructed the dam.

Ross Pickett testified that he was along the channel of the creek on July 18, 1959, and no water was flowing into the pond where defendant's dam had been; that along the channel above that point "there were several places where the creek did—there was—water rose, and then sank in the channel above there."

Defendant and his witnesses also variously testified that the water had ceased to flow in the channel or in Bullers' ditch on and prior to the construction of the Kidd reservoir.

This evidence served only to contradict, and create a conflict with, the evidence offered by plaintiffs and their witnesses. We have stated and set out the foregoing testimony for the purpose of showing that there is substantial evidence in the record to support the findings of the trial court.

Defendant himself recognized that the creek channel had an underground flow as well as a surface flow. In testifying concerning observations made by him along the channel above the damsite, on the 15th of July, 1959, defendant answered a question as to whether water was flowing in the channel as follows:

"Well, it was sinking and then it would raise and sink, and the water channel is very porous, and it will sink for a ways and then raise up. And that's what it was doing at the time where we quit going."

The evidence supports the court's finding that the water or seepage uncovered in the

construction of the dam was a part of the creek flow.

■ Buller's right was not limited to any particular season. He testified he used the water for irrigation any time it would flow upon his land; in addition to the usual irrigation season he used the water in early spring, late summer, and fall. In this he was supported by the testimony of his son and Mr. Knight. Any time the water, if unobstructed, would reach his land, he was entitled to have it flow uninterrupted. I.C. §§ 42–103, 42–106; Beecher v. Cassia Creek Irr. Co., 66 Idaho 1, 154 P.2d 507; Jones v. McIntire, 60 Idaho 338, 91 P.2d 373; Bachman v. Reynolds Irr. Dist., 56 Idaho 507, 55 P.2d 1314; Short v. Praisewater, 35 Idaho 691, 208 P. 844.

The evidence is conclusive that the dam as constructed by defendant would, and in 1959 did, interfere with and infringe upon Bullers' prior right. Defendant testified that no water could flow past the dam until the reservoir above it was filled. Then any excess would flow over the spillway. The reservoir was not full when it was opened by plaintiffs on June 30, 1959. A part, if not all, of the waters produced by the rains which followed in early July and which were used by Bullers, would have been taken from him by a junior claimant.

Assuming, as defendant contends, that no water was flowing in the channel at the point where he constructed his dam, on June 25, 1959, a "dry year," that fact would not justify him in placing a permanent dam in the channel which would obstruct the flow later in the season in other years when there was more snow on the watershed above, and a consequently longer runoff period. Likewise when the flow returned in late fall, as testified to, the dam would prevent it from reaching plaintiffs below until the reservoir overflowed. Also, the increased flow at night, following the spring runoff, which reached plaintiffs' premises each year, after the daytime flow had ceased, would be effectively stopped by the dam.

In the case of Weeks v. McKay, 85 Idaho 617, 382 P.2d 788, an upper riparian owner constructed a dam at the outlet of a small lake, which interfered with the flow to a prior appropriator below. This court upheld the judgment enjoining the maintenance of the dam at a height above the natural level of the outlet, when it would interfere with the rights of prior appropriators.

■ Defendant cites Mountain Home Irr. Dist. v. Duffy, 79 Idaho 435, 319 P.2d 965; Knutson v. Huggins, 62 Idaho 662, 115 P.2d 421; Glavin v. Salmon River Canal Co., Ltd., 44 Idaho 583, 258 P. 532; Hutchinson v. Watson Slough Ditch Co., 16 Idaho 484, 101 P. 1059. These cases hold that it is the policy of the law to prevent waste and to secure the maximum

beneficial use of the waters of the state, and that when and to the extent that a prior appropriator is not beneficially using the water appropriated, it becomes public water, and he must allow it to flow past his diversion for the use of junior appropriators. The rules there annunciated are not applicable here for the reason that in this case defendant by means of his reservoir proposes to withhold the water from the prior appropriators at times when it is needed, and would be beneficially used, by them.

■ The record also supports the court's finding that Wards had established a prior right as against defendant Kidd. They were privileged to use the Bullers ditch on their property for any useful purpose so long as such use did not obstruct or diminish the full enjoyment by Bullers of the easement he held for the delivery of his water through the ditch across Wards' land. Reynolds Irr. Dist. v. Sproat, 69 Idaho 315, 206 P.2d 774; Tomchak v. Harris, 54 Idaho 448, 32 P.2d 1025; Pioneer Irr. Dist. v. Smith, 48 Idaho 734, 285 P. 474. They had used the water in the ditch for watering of livestock continuously for more than five years, and in effect, so far as defendant was concerned, had appropriated a portion of the creek flow to that use. Any defect in their right as against Bullers could be of no avail to defendant.

"This action being to ascertain, determine, and decree the extent and priority of a right to the use of water, and partaking of the nature of an action to quiet title to real estate * * *, appellant must rely upon the strength of its own title to establish its right and not upon the weakness of that of its adversary." Harris v. Chapman, 51 Idaho 283, at 293, 5 P.2d 733, at 736.

■ Defendant offered proof that the reservoir was small and of limited capacity, and therefore would not substantially impede or diminish the flow of water available to plaintiffs. However, the plaintiffs' rights to the use of the water were valuable rights. The law cannot countenance the invasion of a right merely because it is small. The holder of such a right is entitled to its protection to the same extent as if it were of greater magnitude. Idaho Constitution, art. 1, § 18.

■ The judgment denying defendant's claim for damages resulting from removal of the obstruction by plaintiffs, was proper. The dam constituted a private nuisance, I.C. § 52–101, and it was plaintiffs' right to abate it, I.C. § 52–302. The equipment they took to the site crossed over sagebrush land causing no injury, and they had a right to reasonable access to the channel to secure and safeguard their

water right. Carey Lake Reservoir Co. v. Strunk, 39 Idaho 332, 227 P. 591; Fischer v. Davis, 19 Idaho 493, 116 P. 412.

The following facts and circumstances are sufficient to support the court's finding of contempt and the judgment entered thereon, to wit: defendant's response (hereinabove quoted) to Bullers' suggestion that he could impound water for his livestock below the Bullers' diversion; his answer at the hearing in the contempt proceeding, "I hope it is," when asked if the dam was still there; the fact that he rebuilt the dam in exactly the same manner as it previously had been constructed, and enclosed it with a fence, at a time when he knew the court had announced it would enter judgment against him on the merits; and thereafter continuing to maintain the dam in the face of a judgment enjoining him from so maintaining the structure.

The judgment on the merits in the action for injunction is affirmed.

The judgment in the contempt proceeding is modified to allow defendant ten days after the filing of the remittitur from this court, to purge himself of the contempt and the judgment thereon in the manner set out in the judgment.

Costs to respondents.

KNUDSON, C. J., and McQUADE, McFADDEN and SMITH, JJ., concur.