**James L. HUFFMAN, Plaintiff,**

v.

**MONTANA SUPREME COURT and James Harrison, Individually and as Chief Justice of the Montana Supreme Court, Defendants.**

**Civ. No. 2208.**

United States District Court,
D. Montana,
Helena Division.

March 8, 1974.

James H. Goetz, Bozeman, Mont., for plaintiff.

Robert L. Woodahl, Atty. Gen., J. C. Weingartner, Charles Ed Laws, Deputy Attys. Gen., Helena, Mont., for defendants.

Before KILKENNY, Circuit Judge, EAST, Senior District Judge, and BATTIN, District Judge.

## OPINION AND ORDER

BATTIN, District Judge:

This case presents a novel question to the federal courts as to the constraints imposed by the Equal Protection Clause of the Fourteenth Amendment on the criteria a State may adopt for admission to the bar. The plaintiff, James L. Huffman, is a graduate of the University of Chicago Law School and a resident of the State of Montana. On July 14, 1972, he filed a petition for admission on motion to the Montana bar with the defendant, Montana Supreme Court. The defendant, on July 21, 1972, denied plaintiff's petition. Shortly thereafter, the plaintiff commenced this action in which he seeks to restrain the defendant Montana Supreme Court from implementing that portion of Section 93–2002,[1] Revised Codes of Montana, 1947, which excepts the graduates of the University of Montana Law School from the requirement that applicants to the Montana bar undergo an examination as to their qualifications prior to their admission to the Montana bar. The plaintiff further seeks a Mandatory Injunction ordering the defendant to admit plaintiff to the Montana bar. In short, the plaintiff urges this court to declare Montana's statutorily enacted "diploma privilege" to be violative of the Equal Protection Clause of the Fourteenth Amendment.

1. The statute in contention, Section 93–2002, Revised Codes of Montana, 1947, reads as follows:

"*Qualifications, examination and admission.* Every applicant for admission as an attorney and counselor must produce satisfactory testimonials of good moral character, and a certificate of one or more reputable counselors at law that he has been engaged in the study of law for two successive years prior to the making of such application, and undergo a strict examination as to his qualifications by any one or more of the justices of the supreme court. The form and manner of the examination shall be as the justices may, from time to time, determine; provided, however, that a diploma from the department of law of the University of Montana at Missoula, or evidence of having completed the course in law of three years of said department, shall entitle the holder to a license to practice law in all the courts of this state, subject to the right of the chief justice of the supreme court of the state to order an examination as in ordinary cases of applicants without such diploma or evidence."

When statutes are challenged under the Equal Protection Clause, the court developed various doctrines to evaluate the statutes' constitutionality. Under one doctrine, the constitutional safeguard of the Equal Protection Clause is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective. McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960). The court has enumerated several rules for the implementation of this traditional doctrine:

"1. The equal-protection clause of the 14th Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1910).

The courts have also applied an equal protection doctrine of relatively recent vintage: the rule that statutory classifications which either are based upon certain "suspect" criteria or affect "fundamental rights" will be held to deny equal protection unless justified by a "compelling" governmental interest. Those

"suspect" criteria include wealth, race, nationality and alienage. Those "fundamental rights" include the right to freedom of speech, the right to vote, and the right of interstate travel. Obviously this doctrine requiring a showing of a substantial and compelling reason is more rigorous than the traditional doctrine which allows classifications unless they are without any reasonable basis.

First, then, this court must determine which standard of review is appropriate. Is the criterion of the classification—i. e., graduation from one law school versus graduation from other law schools—"suspect"? This court concludes not. Certainly a real and substantial distinction exists between one's wealth, race, nationality or alienage (over which one may exercise little, if any, control) and one's choice of institutions at which to study law.[2]

The court also concludes that no "fundamental right" is affected by the classification. The authority to practice law is not a fundamental right such as the right to the freedom of speech, the right to vote or the right of interstate travel.

As the Supreme Court observed in Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957):

"We need not enter into a discussion whether the practice of law is a 'right' or 'privilege.' Regardless of how the State's grant of permission to engage in this occupation is characterized, it is sufficient to say that a person cannot be prevented from practicing except for valid reasons." Schware, supra at page 239, footnote 5, 77 S.Ct. at page 757.

A more recent treatment of this question by the Supreme Court was made in a judgment authorized by Justice Black with three Justices concurring and one Justice concurring in the result. Justice

2. In fact, the record before the court includes the following statement of uncontested fact: "That plaintiff knew he would be eligible for admission to the Montana bar on motion if he graduated from the University of Montana Law School prior to the time he entered the University of Chicago Law School."

Black wrote: "The practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character." Baird v. State Bar of Arizona, 401 U.S. 1, 8, 91 S.Ct. 702, 707, 27 L.Ed.2d 639 (1970). Whether this recent pronouncement establishes the practice of law as a "right", or not, it is not a fundamental right. Moreover, this is not a case where one who has established his learning qualifications and moral character has been deprived of any right.

Brother East, however, would require the state to show a compelling governmental interest after concluding that the classification created by the diploma privilege affects the fundamental right of interstate travel. With great respect to Brother East, this court rejects his conclusion.[3] We find that the compelling state interest doctrine is not applicable to the case at bar. The proper judicial inquiry is whether any rational justification can be stated for the existence of the diploma privilege.[4]

"State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, supra, 366 U.S. at 425–426, 81 S.Ct. at 1104.

The object of the classification under scrutiny in the instant case, Sec. 93–2002, R.C.M.1947, is to ensure that the courts and people of Montana are represented by attorneys who are of sound ethical character and of competent legal skills.

■ There exists a series of cases (relied upon by the plaintiff) in which residence requirements to practice law were found to be violative of the Equal Protection Clause. Potts v. Supreme Court of Hawaii, 332 F.Supp. 1392 (D.Hawaii, 1971); Keenan v. Board of Law Examiners, 317 F.Supp. 1350 (E.D.N.C.1970); and Lipman v. Van Zant, 329 F.Supp. 391 (N.D.Miss.1971). The courts held that residence requirements have no reasonable relationship with an applicant's fitness or capacity to practice law. But, again, the question before this panel is whether the diploma privilege, as expressed in Section 93–2002, R.C.M.1947, bears a reasonable relationship with an applicant's fitness and capacity to practice law.[5]

The defendants here, proceeding upon the authority of Section 93–2002, R.C. M.1947, require that all applicants to the bar in Montana demonstrate the scholastic and mental ability to practice law, as well as the ethical necessities, before they are admitted. This demonstration of scholastic and mental ability is accomplished through two modes in Mon-

3. The court addresses itself to the right of interstate travel *infra*.

4. This court is persuaded by significant precedent, as well as reason, in applying this doctrine to bar admission cases. The Supreme Court, in *Schware, supra,* 353 U.S. at page 239, 77 S.Ct. at 756, observed:
"A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law." See also Smith v. Davis, 350 F.Supp. 1225, 1229 (S.D.W.Va., 1972), and Hackin v. Lockwood, 361 F.2d 499, 502 (9 Cir. 1966).

5. This question is one of first impression to the Federal courts. Several state courts

have found statutory enactments of the diploma privilege to be invalid. Ex parte Steckler, 179 La. 410, 154 So. 41 (1934); In re Day, 181 Ill. 73, 54 N.E. 646 (1899), and Application of Kaufman, 69 Idaho 297, 206 P.2d 528 (1949). These statutes required that graduates of a state law school be admitted to practice on motion. The courts found in those cases that the legislatures had divested the courts of control over bar admissions. This is not the case here. The Chief Justice of the Montana Supreme Court, under Section 93–2002, R.C.M.1947, has the right to examine further applicants to the state bar who proceed under the diploma privilege. Furthermore, none of these cases relied upon equal protection grounds for invalidating the statutes in question.

tana—(1) graduates of the University of Montana Law School must complete the required course of instruction with its emphasis on Montana law, and (2) graduates of other law schools must demonstrate their proficiency by taking the Montana bar examination. This classification is reasonably related to the object of ensuring a competent and ethical bar.

The record before the court includes the following from the statement of uncontested facts:

"That the University of Montana School of Law was inspected in 1957, 1964, and 1968 by the Section on Legal Education and Admissions to the Bar of the American Bar Association; that these reports are incorporated by reference as a part of these agreed statements of fact." [6]

In one of these reports—that of 1968—the following statement is included:

"The program of studies is designed to prepare a graduate to practice successfully in any jurisdiction in the U. S. Naturally, the large majority of graduates practice in Montana. Thus Montana statutes and cases are considered in supplementary materials prepared by the instructor in most courses." (1968 Report at page 4.)

And from another report:

"The diploma privilege exists in Montana and the school explores thoroughly the moral qualifications of all applicants. No law school in America does a better job on this score and the school is entitled to commendation." (1957 Report at page 2.)

In short, graduates of the University of Montana Law School enroll in courses which emphasize Montana statutes and case law. These graduates must establish their moral qualifications prior to admission to the school. Furthermore, as the same American Bar Association report indicates:

"Each year thereafter [after admission] and also prior to graduation he [each University of Montana School of Law student] must execute an affidavit that 'since the dates of the last previous certificate and affidavit executed by me, nothing has occurred which I would be required to add to my answers to the foregoing questionnaire or which would require modification thereof if I were filling it out originally this day' . . . * * * ." (1957 Report at page 11.)

Thus, the University of Montana Law School graduate is annually required to update his report of moral qualifications.

On the other hand, the record before this court is bare of any evidence that University of Chicago law graduates, such as the plaintiff, make any demonstration of their moral fitness to practice law. Furthermore, the University of Chicago Law School does not emphasize Montana statutes or case materials in its course work. Again from the uncontested statement of facts:

"That the curriculum of the University of Chicago Law School and Fletcher School of Law and Diplomacy did not emphasize any law or any course peculiar to Montana at the time plaintiff was in attendance at these institutions."

Naturally, the Montana Supreme Court could not admit a University of Chicago Law School graduate upon motion without inquiring into his moral

---

**6.** These reports reflect inspections made at the request and at the expense of the University of Montana Law School to satisfy American Bar Association requirements and also those of the Northwest Association, which is the regional accrediting agency that evaluates the University of Montana institution as a whole.

The reports deal with: plant facilities; admission standards; the age, experience, salary, turnover and size of the faculty; program offerings; quality of the law review; library material; the operating budget; Board of Visitors; and the Inspector's impression of the students. The degree of emphasis placed upon the above areas varies from report to report, apparently a reflection of the Inspector's concern for the particular year involved.

qualifications and his knowledge of Montana statutes or case law. To do so, that Court would have to overlook Section 93–2002, R.C.M.1947, and the objective of that statute—namely, to ensure that the courts and people of Montana are represented by competent and ethical counsel.

There are other marked differences between the University of Chicago Law School and the University of Montana Law School. The 1969–1970 University of Chicago Law School Announcement was admitted into evidence without objection when the parties presented oral arguments on this matter. The 1969–1970 Announcement is critical in this case because it represents the year that the plaintiff was admitted to the University of Chicago Law School, and the announcement of that year includes the graduation requirements applicable to the plaintiff. The following statement is found on page 15 of that announcement: "The work of the first year is prescribed." The first year courses are enumerated on pages 16 and 17 of the announcement. They include the following: 301. Elements of the Law; 302. Contracts; 303. Criminal Law; 304. Civil Procedure; 305. Property; 306. Torts; 307. American Constitutional History; and 308. Tutorial Work. "The program of the second and third years is elective." (Announcements, page 15.) In short, only the above-enumerated courses are required for graduates of the University of Chicago School of Law.

By means of comparison, the parties stipulated that the University of Montana Law Catalog covering the course and graduation requirements for the same time period also be included as part of the record. That catalog reads, in pertinent part, that:

"Candidates for the degree of Juris Doctor (J.D.) must: * * * (4) complete all courses taught in the first and second year as specified in the program of instruction and the following third year courses: Courtroom and Office Practice, Federal Taxation, Law Review or Legal Aid, and one seminar each semester." (University of Montana Law Catalog, 1968–70, page 14.)

The first and second year courses are enumerated on page 28 of the catalog. They include the following: 511 Contracts I; 543 Torts I; 535 Property I; 531 Legal Writing I; 525 Introduction to Law; 515 Criminal Law; 512 Contracts II; 544 Torts II; 536 Property II; 532 Legal Writing II; 505 Civil Procedure I; 508 Criminal Procedure; 553 Agency and Partnership; 561 Commercial Transactions I; 569 Estate Planning I; 583 Legal Writing III; 557 Civil Procedure II; 573 Evidence; 554 Corporations; 562 Commercial Transactions II; 570 Estate Planning II; 584 Legal Writing IV; 564 Constitutional Law; and 590 Professional Responsibility. Thus it is obvious that University of Montana Law School graduates must take required courses in criminal procedure, agency and partnership, commercial transactions, estate planning, evidence, corporations, courtroom and office practice, and federal taxation. Similar requirements for University of Chicago Law School graduates do not exist.

Certainly the diploma privilege creates two classifications of law schools approved by the American Bar Association. Those of the University of Montana Law School and those of other law schools. The plaintiff contends that the Montana Supreme Court has no statutory authority over the policies of the University of Montana Law School, either as to the character qualifications of its students or the law curriculum. He further points to the uncontested statement of fact that the Chief Justice of the Montana Supreme Court has never exercised his discretion to require a University of Montana Law School graduate to take the bar examination and that there is no evidence that the Supreme Court has required a supplemental showing as to character qualifications. We feel that the plaintiff again misses the point. Obviously the fact that the Chief Justice has declined to exercise this discretion lends further

credence to the conclusion that he, and other members of the Montana Supreme Court, are satisfied with the University of Montana Law School's curriculum and character qualifications. Certainly, if the Chief Justice of the Montana Supreme Court were not satisfied with the preparation of students at the University of Montana Law School, he would require examinations.

In short, the court will concede that the Montana Supreme Court has no control over the University of Chicago Law School. But it cannot concede that the Montana Supreme Court has no control over the University of Montana Law School. In fact, the uncontested statement of fact reveals that "the defendants are familiar with the University of Montana Law School, its faculty, and the courses it offers" and " . . . that the Dean [of the University of Montana Law School] consults with the Montana Supreme Court on matters involving curriculum, students, school operation and policy." The record further reveals that "the defendant, Chief Justice James T. Harrison, and Associate Justice Wesley Castles, are members of the University of Montana School of Law's Board of Visitors." That Board "is charged with the responsibility of evaluating, advising and counseling the dean and faculty at the University of Montana Law School; [and] that the Board of Visitors visits and investigates the University of Montana Law School periodically and recommends various changes in the curriculum and operation of the school. . . . "

These uncontested statements forming a part of the record of this case are buttressed by the following language of the Montana Supreme Court in another case:

"Montana is a relatively small state in terms of population. Members of this Court are and have been on personal relationship with the faculty of the law school over the years. We hire annually three to five graduates as law clerks. We interview many more. We are ordinarily personally acquainted with student body, faculty, and curriculum to an extent that we can, in complete good faith gauge the fitness of the graduating students as a body, relying on the grading system of the faculty for scholarship.

"Comparatively, as to all others taking the Bar examination this personal relationship and resultant knowledge does not exist nor can it; we simply do not have the opportunity to gauge in any manner the scholastic or mental abilities of these applicants for admission except through our process of examination. In our process of examination the legislature has provided for a board of bar examiners to be appointed by this Court. This board is comprised of outstanding members of the legal profession in whom this Court imposes great confidence to fairly and fully test applicants, such as petitioner, for competence and fitness to practice law. Such examination is prepared by the board members. This Court has kept in constant touch with the system, both for its adequacy and for fairness. In our considered judgment, our board of bar examiners does an outstanding job.

"However, we have the same opportunity to keep in touch with the educational and testing process of the law school at the University of Montana, and in gauging the results in as good a manner as is humanly possible.

"In all methods of screening, testing, and passing on the qualifications and fitness of applicants for our bar, the ultimate goal is to provide competent legal service to the public. In the final analysis, it is the protection of the public that determines all of our methods of passing on the qualifications and fitness to practice law."

Goetz v. Harrison, 154 Mont. 274, 280–281, 462 P.2d 891, 894 (1969).

## RIGHT TO INTERSTATE TRAVEL

■ The court must also address itself to the dissent of Brother East inso-

far as he concludes that the plaintiff's contentions include a claimed infringement upon his constitutional right to freely travel from state to state. This conclusion must primarily rest upon the leading case law in this field—namely, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972). In *Shapiro*, the court declared unconstitutional certain State of Connecticut and District of Columbia statutory provisions which denied welfare assistance to persons who had not resided within the geographical boundaries of those jurisdictions for at least one year immediately proceeding the application for assistance. The Court reasoned that the classification served to limit the constitutionally protected right of the plaintiffs to travel, and that the defendants had failed to prove that there was a compelling Governmental need for discrimination. The Court held:

> "Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible." *Shapiro, supra,* 394 U.S. at 631, 89 S.Ct. at 1329.

In *Dunn*, a Tennessee law creating a durational residency requirement of one year for purposes of qualifying residents to vote was held to be in violation of the Equal Protection Clause of the United States Constitution. The Court held that it had the effect of creating a classification which resulted in the denial to some citizens of the fundamental constitutional right to vote and that it directly impinged on the exercise of a second fundamental right, the right to travel.

> "Thus, the durational residence requirement *directly* impinges on the exercise of a . . . fundamental personal right, the right to travel."

(Emphasis supplied.) *Dunn, supra,* 405 U.S. at 338, 92 S.Ct. at 1001.

The diploma privilege does not intend such a "direct impingement" upon interstate travel. Nor is the purpose of the diploma privilege to inhibit migration to Montana. Rather, it is designed to ensure competent and morally fit attorneys. Furthermore, the diploma privilege is not a residence requirement.

Certainly there exist numerous statutes in our several states which may affect citizens in their decisions of whether to travel to or reside in those states. For example, a state may impose a sales tax upon specified commodities in trade. A state may also impose speed limits upon drivers of motor vehicles upon that state's public highways. While a sales tax or a speed limit may influence some citizens in their decisions of whether to travel to or reside in our states, those statutes do not constitute a direct impingement upon the fundamental personal right of interstate travel.

Similarly, the diploma privilege does not constitute a direct impingement upon the fundamental right of interstate travel. As evidenced by the uncontested statement of facts, the "plaintiff knew that he would be eligible for admission to the Montana Bar on motion if he graduated from the University of Montana Law School prior to the time he entered the University of Chicago Law School." Yet, the diploma privilege did not in any way impinge upon the plaintiff's right to travel to Illinois to attend school. Nor did the diploma privilege in any way impinge upon the plaintiff's residency in the State of Montana.[7] In short, the diploma privilege, as enacted in Section 93–2002, R.C.M.1947, like numerous other state statutes, does not directly impinge upon the fundamental right of interstate travel. There is a very real and substantial distinction between a diploma privilege and a residence requirement. The latter does con-

7. The uncontested statement of facts includes the following: "The plaintiff is a resident of the State of Montana . . . . ."

stitute a direct impingement upon interstate travel and consequently is justifiable only after the showing of a compelling state interest.

 While we have held that the traditional doctrine in testing an alleged violation of the Equal Protection Clause is applicable to the case at bar, we also express the view that the defendants in this case have met the showing of a compelling governmental interest in the quality and integrity of the persons whom it licenses to practice law and *may impose regulations which promote that interest.* In this connection, Mr. Justice Frankfurter wrote:

> "From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been *compendiously described as* 'moral character.'" *Schware, supra,* 353 U.S. at 247, 77 S.Ct. at 761, 1 L.Ed.2d 796 (concurring opinion).

To the greatest extent, the law depends upon *disciplined standards of the* profession and belief in the integrity of the courts in prescribing rules of admission. We cannot fail to accord such confidence to the state process, and we must attribute to its courts the exercise of a fair and not a biased judgment in passing upon the application of those seeking entry into the profession.

The courts have held that:

> "A state may require its bar members to be of good moral character and fit to practice their profession." Suffling v. Bondurant, D.C., 339 F. Supp. 257, 259 (1972).

The Supreme Court has made the following observations:

> "Undoubtedly Ohio has a legitimate interest in determining whether an applicant has 'the qualities of character and the professional competence requisite to the practice of law.'" Application of Stolar, 401 U.S. 23, 29,

91 S.Ct. 713, 716, 27 L.Ed.2d 657 (1971).

> "We recognize the importance of leaving States free to select their own bars * * *." Konigsberg v. State Bar of California, 353 U.S. 252, 273, 77 S.Ct. 722, 733, 1 L.Ed.2d 810 (1957).

> "It is undisputed that a State has a constitutionally permissible and substantial interest in determining whether an applicant possesses 'the character and general fitness requisite for an attorney and counsel-at-law.'" (Citations omitted.) In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973).

To summarize, it could not be seriously argued that a state might without being guilty of invidious discrimination determine the areas of law in which a bar applicant should be proficient and also the degree of proficiency which should be attained. Apart from the fact that the University of Montana Law School's requirements more nearly match the areas of law deemed important in Montana by the Court (as indicated by Rule VI B6 of the Rules of the Supreme Court) than do the requirements of the University of Chicago Law School, the more important fact remains that from its relationships with the law school and from its experience with the graduates of that school, who comprise the greater part of the Montana bar, the Court can empirically determine whether the breadth of the legal education of the Montana Law School measures up to the Court's expectations and whether the graduates do in fact have the requisite proficiency. The fact that as to one set of graduates the Court from its personal experience has a basis of confidence in the breadth and quality of its legal education, which from personal experience it cannot have as to another set, is ample reason for discriminating between the two.

It is ordered that plaintiff be denied all relief.

EAST, Senior District Judge (dissenting):

I respectfully dissent. The majority opinion deals with the problem presented as if the language of Section 93–2002 expresses the present day academic qualifications or prerequisites of a candidate for admission to the Bar of Montana. In that context, I would agree that no knowledgeable person would argue against the virtues of the "diploma privilege" proviso versus the two-year study of law plus Bar examination qualifications, nor consider such a classification among candidates from the two categories discriminatory per se. However, the Supreme Court of Montana in its wisdom and extreme interest in developing a higher level of legal academic prerequisites of the applicants for admission to the Bar of that state abrogated the two-year study of law prerequisite by adopting on December 25, 1961, its Rule XXV establishing a single standard of academic qualifications of such applicants, viz.: a "graduate of a law school approved by the American Bar Association." (ABA.)

The "diploma privilege" proviso when introduced into the now passe two-year study of law prerequisite of learning in the law was an upgrading of law study standards, and yet in all frankness its force and effect then and particularly now in view of Rule XXV is, for one reason or the other not necessary to pursue, pure state provincialism in favor of the graduates of the Montana Law School. That policy is, of course, of the state's choice just so long as an individual's federal constitutional guarantees are not thereby infringed.

The majority elects to treat plaintiff's contentions as an attack aimed solely at the "diploma privilege" proviso as being a denial of equal protection of law as guaranteed by the Fourteenth Amendment.

I believe the plaintiff's contentions attack the force and effect of the statutory scheme which requires a bar examination to be successfully undertaken by graduates "of a law school approved by" ABA *other than* the Montana Law School. The "diploma privilege" proviso is the favoring feature that places the statutory scheme or requirement of a bar examination in jeopardy for being discriminatory among residents of Montana in like standing, and constitutes a burdening of one's fundamental right to travel. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). I do not understand that the Supreme Court of Montana denied plaintiff's application for admission to the Bar, without examination, on any other ground than that he did not have a diploma of graduation from the Montana Law School, an ABA approved law school; notwithstanding the fact plaintiff held the same academic qualifications as any other "graduate of a law school approved by the [ABA]" as proscribed by Rule XXV.

It is quite likely that not all students during enrollment time and at time of graduation from the Montana Law School are residents of that state; however, all applicants for admission to the Bar of that state must then be actual bona fide residents of that state. Accordingly, the statutory bar examination requirement and the "diploma privilege" proviso, coupled with Rule XXV, create two classes of resident graduate-candidates for admission to the Bar: (a) favored graduates of the Montana Law School, an approved ABA law school, and (b) disfavored graduates of another approved ABA law school. Members of class (a) are admitted to the Bar without the burden of taking a bar examination and the members of class (b) sustain that burden. The plaintiff is among those in class (b) because he has recently exercised his fundamental right to travel from state to state.

The majority discounts the favoring feature because of the discretionary authority vested in the Chief Justice to order an examination by applicant graduates of the Montana Law School; yet, the Chief Justice has never exercised

such discretionary authority. Such non-action is a badge of discrimination in and of itself. The majority in effect suggests that the Chief Justice has not exercised the discretionary authority because of his knowledge and faith in the workings of the Montana Law School and its product. If that be so, then the non-exercise of the discretionary authority is based upon personal information rather than judicial and an exercise of judicial discretion is not involved.

The majority concludes that no "fundamental right" is affected by the classification and would justify the discriminatory force and effect of the statutory scheme under the "reasonable basis" test developed in 1910. More modern authority has extended the test to include the ingredient of rationality. *Schware*, cited by the majority for another point, 77 S.Ct. at page 756, points out, while "a state can require high standards of qualification, such as . . . proficiency in the law, before it admits an applicant to the bar . . . any qualification must have a *rational* connection to the practice of law."

It is indeed a delicate and ticklish posture for one to compare the relative merits and qualities of academic accomplishments held by the graduate of one ABA approved law school over those of another. Academicians argue, as do the judges, over the merits of the required versus elective subjects course of study in our professional schools in producing good lawyers. Academicians usually debate with more force and theoretical conviction. The judges only view the end product. Still, there is no clear-cut consensus.

Assuming, *arguendo*, that the rational and reasonable basis test of justifying the discrimination and unequal treatment afforded plaintiff under the force and effect of the statutory scheme is proper to be utilized here, I cannot agree that the comparison of the curriculum of one ABA approved law school's catalogue with another's is a reasonable rationality upon which to waive the re-

quirement of taking a bar examination in favor of the graduates of one such approved law school and in turn demand and require such an examination by graduates of all other such approved law schools.

The majority points out that the Supreme Court of Montana maintains close liaison with the faculty and the curriculum at the Montana Law School and knows the end product of that school; however, the Supreme Court holds no lawful authority or direction over the faculty, course of study or the end product of the Montana Law School whatsoever. The Supreme Court of Montana could well have given credence and force to its faith in the legal academic qualifications of the end product of the Montana Law School by fixing through rule the legal academic qualifications of an applicant for admission to the Bar as a graduate of the Montana School of Law. Rather, the Court adopted and abides by its Rule XXV which does not require anything more of the Montana Law School by way of course of study, character standards and its end product through graduation than does an ABA accreditation require of any approved law school. Indeed, the "diploma privilege" does have a reasonable relationship with an applicant's fitness and capacity to practice law in Montana. Suffice to say, it is a statutory presumption of such fitness and capacity on the part of a Montana Law School graduate applicant. The real query is whether the statutory requirement of a bar examination to be undertaken by graduates of another ABA approved law school and the agreed discrimination resulting therefrom is justifiable. I cannot agree that any rational or reasonable basis exists for such discrimination. See Potts v. Supreme Court of Hawaii, 332 F. Supp. 1392, 1397.

The majority and I part company primarily over the issue of the force and effect of the statutory scheme coupled with Rule XXV upon the plaintiff's exercise of his fundamental right to travel. While the majority does deal with that

issue, they do so in rather short shrift, and I cannot subscribe to the write-off of the issue so handily.

The majority's recital that the plaintiff knew that graduates of the Montana Law School would be favored in the process of admission to the Bar at the time he entered a disfavored ABA approved law school only points up the unhappy fact of provincialism—come to us or else. Plaintiff also knew that under Rule XXV a graduate of an approved ABA law school held all of the legal academic requirements and prerequisites necessary for admission to the Bar of Montana. He could also expect that his fundamental right to travel among the states and receive equal treatment with other residents under law would be honored.

In my view, the majority misreads the full thrust of the rationale of *Shapiro* and *Dunn* by taking from those cases a concept for weighing the severity of the denial of benefits, or burdening of legal entitlements involved; that is, the denial of the right to vote or the denial of welfare necessities of life as being harsher than the denial of license to drive a car or even to practice law. Fuentes v. Shevin, 407 U.S. 67, at pages 88, 89 and 90, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1971), clearly evaporates such a test of constitutionality. *Shapiro* and *Dunn* protect the fundamental right to travel from sustaining burdens not imposed on other residents in like standing, rather than some right to the necessities of life or to vote. The aggrieved parties were, as is the plaintiff here, actual residents of the given state who had exercised their right to travel and were penalized in sharing legal entitlements offered by the state with other residents in like standing equally under the law. The same rationale applies whether it be in the state's exercise of police powers, taxation, provisions for state grants of welfare, school benefits or licenses to engage in lawful pursuits. So here the requirement of the Bar examination is a state imposed burden upon the plaintiff's exercise of his right to freely travel to Montana and receive equal treatment with other residents in like standing under the laws of that state.

I cannot escape the fact that the plaintiff, who holds the same academic qualifications required by Rule XXV as do graduates of the Montana Law School, is penalized and burdened under the statutory scheme in the exercise of his constitutional right to freely travel and apply for a license to practice law on equal footing.

The full thrust of the rationale and holding of *Dunn*, 405 U.S. at 342, 92 S. Ct. 995, authorizes the flat statement that the statutory requirement of a Bar examination forces a resident graduate of an out of Montana ABA approved law school who wishes to travel to Montana *to choose* between the exercise of his basic right to travel and his basic right to receive equal treatment in lawful pursuits under the laws of Montana with other resident graduates of an in Montana ABA approved law school. "Absent a compelling state interest, a State may not burden the right to travel in this way." Manifestly, Montana has failed to show herein a "compelling state interest" in justification of the burden placed upon the plaintiff.

I would annul the statutory requirement of a Bar examination on the part of out of state graduates of an ABA approved law school so that such out of state graduates may share in the "diploma privilege" proviso along with the graduates of the Montana Law School and order the defendants to reconsider the plaintiff's application for admission to the Bar without the taking of a Bar examination in light of the views and conclusions expressed herein.

In the spirit of state-federal relations and comity, I would respectfully suggest that the Supreme Court of Montana has the same prerogative it exercised in adopting Rule XXV, if it chooses, to likewise provide by rule comprehensive academic or legal training qualifications and other prerequisites for admission to the Bar that will apply equally to all qualifying residents, and meet all federal constitutional challenges.