ZAIDA ROMÁN VARGAS y OTROS, demandantes y recurrentes, *v.* TRIBUNAL EXAMINADOR DE MÉDICOS DE PUERTO RICO, demandado y recurrido.

*Número:* R-84-458    *Resuelto:* 23 de enero de 1985

---

74

*José Luis Velázquez Ruiz,* abogado de los recurrentes; *Isabel Muñoz Acosta,* abogada del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El Tribunal Examinador de Médicos es un organismo encomendado por ley para evaluar y autorizar el ejercicio de la profesión de médico cirujano y osteópata en Puerto Rico. En el descargo de esa función ofrece exámenes de reválida totales o parciales por lo menos dos (2) veces al año. El tipo de examen es objetivo, de selección múltiple. [1] Cubre dos áreas generales denominadas Ciencias Básicas y Ciencias Clínicas, consistentes cada una de setenta y cinco (75) preguntas.

Los recurrentes, doctores graduados en medicina, alegaron ante el Tribunal Superior, Sala de San Juan, que no habían aprobado algunas partes de dicho examen y que infructuosamente habían solicitado revisión al Tribunal Examinador. Re-

---

[1] La prueba o *test* objetivo es aquel "constituído por ítems cada uno de los cuales tiene una, o cuando mucho unas cuantas respuestas aceptables y en el que las respuestas aceptables se han establecido de antemano de manera que puedan ser calificadas a máquina, o por un empleado no especializado, utilizando la clave de respuestas. A menudo, la forma requiere la selección de la respuesta escogiéndola de entre posibilidades que se le presentan al examinando". R. L. Thorndike & E. Hager, *Test y técnicas de medición en psicología y educación,* Méjico, Ed. Trillas, 1970, pág. 680.

En el campo de la psicometría, las técnicas de medición aceptan como categorías válidas de preguntas escritas: (1) *objetiva* (selección múltiple, información en espacios en blanco); (2) *ensayo* y (3) *discusión.* Además se admiten las pruebas orales.

clamaron que se les permitiese confrontar sus contestaciones con la clave de respuestas utilizadas para corregirlos y que se identificaran las hojas de contestaciones, en particular las suyas. Invocaron el debido proceso de ley y cuestionaron la secretividad de la adjudicación de las solicitudes de revisión. Adujeron que el Tribunal Examinador se había convertido en juez y parte en el proceso. Impugnaron la constitucionalidad del Reglamento, bajo la prédica de que el procedimiento seguido les privaba "del ejercicio de su derecho de propiedad, sobre los conocimientos que tienen válidamente a ejercer".

El tribunal de instancia (Hon. Wilfredo Alicea López, J., San Juan), en elaborada sentencia, evaluó la forma y mecánica seguida en la administración de la reválida y el trámite interno de revisión o recorrección. Además, tomó conocimiento judicial de nuestra Resolución en *Pagán Astacio* v. *Director Ejecutivo Junta Examinadora de Aspirantes al Ejercicio de la Abogacía* (Núm. Mc-83-30) de 3 de noviembre de 1983. A tono con ese análisis, les proveyó —con carácter de remedio supletorio— lo siguiente:

Se ordena al Tribunal examinador que en el procedimiento de revisión de los exámenes de reválida adopte las siguientes medidas que son de carácter prospectivo:

a. notifique a cada aspirante que no apruebe los exámenes de reválida un desglose de sus calificaciones por materias específicas de tal forma que éste sepa en que áreas falló para que se pueda preparar mejor para exámenes futuros.

b. en el procedimiento de revisión los aspirantes reprobados tendrán derecho a ver y comparar copia de su hoja de contestaciones con copia de las hojas claves del examen de selección múltiple. Esta revisión la conducirá el Tribunal Examinador individualmente o en forma colectiva en la fecha, hora y lugar que determine y utilizará los mecanismos de reproducción que le sean más económicos y viables para cumplir con el propósito y espíritu de esta orden. Los estudiantes reprobados no podrán reproducir dichos documentos ni tomar notas de los mismos ni tendrán acceso al contenido del examen correspondiente de selección múltiple.

c. en caso de que cualquier aspirante desee formular cualquier alegación luego de llevar a cabo la inspección, el Tribunal Examinador proveerá los formularios y el trámite que considere adecuado.

d. a los fines de identificar mejor las hojas de contestaciones en el momento en que suministra el examen, el Tribunal Examinador debe adoptar una oración más comprensiva que la actual que el aspirante copiará en manuscrito como por ejemplo: Esta parte comprende: Ciencias Básicas: Anatomía, Semiología, Fisiología, Bioquímica, C. Conducta, Farmacología, Patología, Microbiología, A.M. —————— Clave ——————. Esto servirá de base para identificar las hojas de contestaciones con el aspirante en caso de controversia.

Inconformes por no habérseles concedido todo, los demandantes argumentan ante nos que son acreedores a conocer y confrontar la clave de respuestas consideradas como correctas en las preguntas del examen. Enfatizan que únicamente de tal modo pueden estar completa y absolutamente seguros que no se ha incurrido en errores en la confección de la clave y corrección. Apoyan esa tesis en el debido proceso de ley y en las Secs. 16 y 17 del Art. II de nuestra Constitución que "reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella . . .", y protege además contra la privación irrazonable de la propiedad, concepto que en su esencia abarca una ocupación. ([2])

## II

Se impone una reflexión mínima en torno a los problemas jurídicos que suscita la reglamentación de profesiones u ocupaciones por parte del Estado.

Estamos ante un área que ha emergido virtualmente con muy poca fiscalización. Ello explica por qué la doctrina no ha madurado suficientemente. Durante la mayor parte del siglo XIX, la reglamentación se limitó a profesiones clásicas, tales

---

([2]) Véase *Ortiz Cruz* v. *Junta Hípica*, 101 D.P.R. 791, 794 (1973).

como Derecho y Medicina. A partir de 1890, a medida que la sociedad se tornó más compleja, el radio de acción comenzó a extenderse hacia otras ocupaciones. Nota, *Due Process Limitations on Occupational Licensing*, 59 Va. L. Rev. 1097 (1973).

■ No obstante ese lento desarrollo, los tribunales, siempre bajo la rúbrica tradicional del poder de razón de estado, ratificaron la autoridad inherente necesaria para legislar en las áreas de la salud, la seguridad, y en términos amplios, el bienestar general. No fuimos la excepción. Desde hace varios años así lo reconocimos. S. P. Amadeo, *La revisión judicial de las juntas examinadoras de Puerto Rico*, 9 Rev. Der., Leg. Jur. C. Abo. Puerto Rico 13–31 (1946). En síntesis, esa jurisprudencia establece que semejantes disposiciones de ley no privan a los ciudadanos de sus profesiones, sino que las regulan por razones del eminente interés público de que están revestidas. *Morales* v. *Junta Exam. de Ing.*, 99 D.P.R. 84 (1970); *Infante* v. *Tribl. Examinador Médicos*, 84 D.P.R. 308, 314 (1961); *Castillo* v. *Tribl. Examinador*, 81 D.P.R. 746, 750 (1960); *Cedeño* v. *Junta Dental*, 79 D.P.R. 549 (1956); *Infante* v. *Junta de Médicos Exam. de P.R.*, 43 D.P.R. 325, 330 (1932); *Pueblo* v. *Rodríguez Alberty*, 39 D.P.R. 599, 601 (1929); *Virella* v. *Carreras et al.*, 22 D.P.R. 777, 780 (1915).[3]

La existencia de esa facultad ya no se discute. Hoy los planteamientos ante los foros judiciales están dirigidos a cuestionar aspectos más complejos y sensitivos, tales como requisitos académicos, experiencia previa, ciudadanía y residencia, reputación y carácter, admisión directa por reciprocidad,

---

[3] Igual trayectoria se sigue en Estados Unidos. Por vía de ejemplo el Tribunal Supremo federal se pronunció así en *Goldfard* v. *Virginia State Bar*, 421 U.S. 773, 777, 792 (1975):

"We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."

**78**

seguro por impericia profesional, composición de los organismos, tipo de preguntas, métodos y criterios de medición, sistema de revisión y otros. (⁴) En lo que respecta al caso ante nos, y a los fines de apreciar los méritos de la contención específica de los recurrentes, es menester explorar las dimensiones doctrinales que han ido perfilándose en época más reciente.

(⁴)Esta litigación ha versado sobre los siguientes extremos:

(1) exigencias educacionales, *Douglas* v. *Noble,* 261 U.S. 165 (1923); (2) requisito de ser graduado de institución acreditada, *In re Application of Hansen,* 275 N.W.2d 790 (Minn. 1978); *Mann* v. *Board of Medical Examiners of the State,* 187 P.2d 1 (1947); *Savelli* v. *Board of Medical Examiners,* 40 Cal. Rptr. 171 (1964); (3) títulos o grados de universidades de países extranjeros, *Ex parte Blanco Amigó,* 97 D.P.R. 891 (1969); (4) experiencia, *Duggins* v. *N.C. Bd. of C.P.A. Examiners,* 212 S.E.2d 657 (N.C. 1975); *O'Donoghue* v. *Board of Examiners, Etc.,* 442 N.Y.S.2d 656(1981); (5) ciudadanía, *Examining Board* v. *Flores De Otero,* 426 U.S. 572 (1976); *In re Griffiths,* 413 U.S. 717 (1973); (6) residencia, *e.g.,* Piper v. *Supreme Court of New Hampshire,* 717 F.2d 110 (1983); *Supreme Court of New Hampshire* v. *Piper,* 53 L.W. 4238 (1985); (7) admisión sin examen por reciprocidad, *Hawkins* v. *Moss,* 503 F.2d 1171 (4to Cir. 1974); (8) seguro contra acciones por impericia profesional, *Jones* v. *State Board of Medicine,* 555 P.2d 399 (1976); (9) validez de la composición del organismo, *Davidson* v. *State of G.,* 622 F.2d 895 (1980).

Respecto al examen de reválida en sí, la jurisprudencia informa sobre: (1) validez, *Douglas* v. *Hampton,* 512 F.2d 976 (D.C. Cir. 1975); *Tyler* v. *Vickery,* 517 F.2d 1089 (5to Cir. 1975); (2) utilización de una entidad privada especializada en su preparación, *Ponzio* v. *Anderson,* 499 F. Supp. 407 (N.D. Ill. 1980); (3) exámenes de ensayo y discusión y la gran subjetividad que permea su corrección o calificación, *Henkes* v. *Fisher,* 314 F. Supp. 101 (D. Mass. 1970); (4) criterios utilizados para corregirlos, *Bowens* v. *Bd. of Law Examiners, Etc.,* 291 S.E.2d 170 (1982); (5) asignación de peso igual a partes de ensayo y selección múltiple, *In re Mead,* 361 N.E.2d 403 (Mass. 1977); (6) exámenes orales, *Dietz* v. *American Dental Ass'n.,* 479 F. Supp. 554 (E.D. Mich. 1979); (7) estándar para fijar la calificación que establece la línea divisoria entre aprobado y suspendido, *Hoover* v. *Ronwin,* 52 L.W. 4535 (1984); *United States* v. *State of North Carolina,* 400 F. Supp. 343 (E.D.N.C. 1975); (8) reclamo de que se acrediten a exámenes subsiguientes las partes aprobadas de uno anterior en que el aspirante obtuvo una calificación de suspendido, *Bailey* v. *Board of Law Examiners of State of Tex.,* 508 F. Supp. 106 (W.D. Tex. 1980); *Davidson* v. *State of G.,* supra; (9) limitación del número de ocasiones en que se puede solicitar el examen, *Younger* v. *Colorado State Bd. of Law Examiners,* 625 F.2d 372 (10mo Cir. 1980); *Poats* v. *Givan,* 651 F.2d 495 (7mo Cir. 1981).

■ El primer principio claro que emerge es el reconocimiento de los tribunales sobre la extensa discreción de los estados y sus juntas examinadoras en la fijación de las normas y procedimientos a regir los procesos de admisión o certificación de personas al ejercicio de profesiones u oficios. ([5])

■ El segundo es que esa reglamentación gubernamental controla los métodos de admisión, pero no las posibilidades. En consecuencia, el Estado viene obligado a trazar objetivos racionales al cumplir con dicha función. Comentario, *Commerce Clause Challenge to State Restrictions on Practice by Out-of-State Attorneys*, 72 N.W.L. Rev. 737, 742–743 (1978); Nota *A Constitutional Analysis of State Bar Residency Require-*

---

([5])En su apoyo se han invocado, entre otras, las siguientes proposiciones:

"En primer lugar, en la sociedad urbana moderna . . . las agencias gubernamentales se responsabilizan de asegurar que las personas encargadas de la salud y el bienestar públicos tengan el conocimiento y la competencia adecuados. Esto sólo puede lograrse definiendo las condiciones de admisión a las ocupaciones y la permanencia en las mismas.

"En segundo lugar, la especialización intensa que caracteriza a nuestra compleja sociedad con frecuencia significa que el público podría no distinguir entre los profesionales competentes y no competentes, honestos y deshonestos. Por lo tanto, las agencias gubernamentales que se encargan de otorgar licencias cumplen una función vital al proteger a la gente del fraude y la deshonestidad.

"En tercer lugar, al licenciar sólo personal competente y bien adiestrado, las agencias que otorgan licencias pueden proteger la vida y la propiedad. . . .

"En cuarto lugar, las juntas 'le proveen al ciudadano promedio que cuenta con poco tiempo y dinero, una avenida administrativa rápida, sencilla y económica para resarcirse' de la negligencia profesional, la deshonestidad o la inmoralidad.

"En quinto lugar, mediante las penalidades, impuestas por los diferentes estatutos —tales como la revocación de la licencia— las agencias que otorgan licencias podrían obligar a los profesionales ya licenciados a mantener estándares altos en su profesión.

"En sexto lugar, las juntas que otorgan licencias —compuestas por expertos— están capacitadas para mantenerse al día con los adelantos científicos y tecnológicos y asegurarse de que el estándar de servicios disponibles para las personas está en armonía con el progreso científico moderno." (Traducción nuestra.) Nota, *Due Process Limitation on Occupational Licensing*, 59 Va. L. Rev. 1097, 1098 (1973).

*ments Under the Interstate Privileges and Inmunities Clause of Article IV*, 92 Harv. L. Rev. 1461 (1978) ; *In re Griffiths*, 413 U.S. 717, 727 (1973) ; *Schware* v. *Board of Examiners*, 353 U.S. 232, 239 (1957).

█ El tercer principio que aflora es que para prevalecer un ataque contra las reglas envueltas tiene que demostrarse que las normas aplicadas niegan arbitrariamente la admisión a los aspirantes por motivos desvinculados al propósito de la reglamentación. *Application of Nort, Nev.*, 605 P.2d 627 (1980). El grado de interés público es tal que sólo se requiere "alguna evidencia" de que las medidas son racionales, y por ende, válidas. (⁶) Massaro, O'Brien, *Constitutional Limitations on State Imposed Continuing Competency Requirements for Licensed Professionals*, 25 Wm. & Mary L. Rev. 253, 274 (1983).

█ Cuarto, bajo este enfoque la presunción de corrección judicialmente atribuida a las determinaciones contributivas ha sido extendida al campo de autoridad de las profesiones reglamentadas por licencia. D. A. Wallace, *Occupational Licensing and Certification: Remedies for Denial*, 14 Wm. & Mary L. Rev. 46, 52 (1972). *The Bar Examiner's Handbook*, Stuart Duhl, *Litigation and Legislative Challenges to Bar Examinations and Procedures*, Chicago, Dartnell Press, 1980, págs. 26, 28–29. En esta clase de casos, la revisión del foro judicial de ordinario explora y atiende la posibilidad de una violación al interés propietario del peticionario. Luego, procede

---

(⁶) En cuanto al requisito de validez de los exámenes, los tribunales han sido más acuciosos al escrutar si el contenido de las pruebas está racionalmente vinculado a las destrezas y conocimientos que el examen pretende medir. Pero ese análisis riguroso ha sido reservado principalmente para exámenes de empleo público o privado. El propósito es minimizar el discrimen por razones de raza y de igual valía constitucional.

Adviértase, sin embargo, que han declinado extender dicho criterio de análisis constitucional estricto a exámenes de admisión o certificación de profesionales, incluso a la profesión de abogado. *Richardson* v. *McFadden*, 540 F.2d 744 (4th Cir. 1976) ; *Tyler* v. *Vickery*, supra.

*a evaluar el "tipo"* de procedimiento requerido. Elementos cardinales como la notificación y el derecho a ser oído no pueden ser obviados. Special Project, *Admission to the Bar: A Constitutional Analysis*, 34 Vand. L. Rev. 655, 712 (1981). *Mebane* v. *Board of Medical Examiners*, N.C. App., 286 S.E.2d 112, 113 (1982); *Muñoz* v. *Department of Registration and Ed.*, Ill. App., 428 N.E.2d 1137, 1138 (1981); *Tomanio* v. *Board of Regents, Etc.*, 603 F.2d 255, 258–259 (1979).

■ Quinto, en función a la naturaleza flexible y pragmática del debido proceso de ley —*Pueblo* v. *Andreu González*, 105 D.P.R. 315, 320 (1976)—, extensible a este tipo de caso, se han ponderado los siguientes factores: (a) el interés privado que pueda resultar afectado por la actuación oficial; (b) el riesgo de una privación errónea debido al procedimiento utilizado; y (c) el interés del Estado, incluyendo su función envuelta y las cargas administrativas y fiscales que conllevaría requerir garantías adicionales o sustitutas. *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

■ Así, los tribunales han rehusado reconocer la revisión absoluta del examen como un derecho constitucional. La orientación judicial, casi unánime, favorece como sustitutos a la revisión categórica, la recorrección o un sistema alterno de medición y evaluación confiables. Prevalece una norma de deferencia hacia las juntas examinadoras al seleccionar cualesquiera de esos métodos. No obstante, puede afirmarse que si se reducen restrictivamente las oportunidades para tomar el examen, la tendencia es ampliar la cobertura del debido proceso de ley. Massaro, O'Brien, *op. cit.*, págs. 299–302. Comentario, *Review of Failing Bar Examinations: Does Reexamination Satisfy Due Process?*, 52 B.U.L. Rev. 286, 296 (1982). Véanse: *Lavash* v. *Kountze*, 604 F.2d 103 (1979); *Poats* v. *Givan*, 651 F.2d 495 (1981); *Davidson* v. *State of G.*, 622 F.2d 895 (1980); *Bailey* v. *Board of Law Examiners of State of Tex.*, 508 F. Supp. 106 (1980); *Tomanio* v. *Board of Regents*,

82

*etc.,* supra; *Muñoz* v. *Department of Registration and Ed.,* supra; *Martin* v. *Educational Testing Service, Inc.,* 431 A.2d 868 (1981); *Mebane* v. *Board of Medical Examiners,* supra; *Application of Peterson,* 499 P.2d 304 (1972); *Tyler* v. *Vickery,* 517 F.2d 1089 (1975); *Petition of Pacheco,* 514 P.2d 1297 (1973); *Whitfield* v. *Illinois Board of Law Examiners,* 504 F.2d 474 (1974); *Hooban* v. *Board of Gov. of Wash. State Bar Ass'n,* 539 P.2d 686 (1975); *Newsome* v. *Dominique,* 455 F. Supp. 1373 (1978); *Huffman* v. *Montana Supreme Court,* 372 F. Supp. 1175 (1974); *Application of Stephenson,* 516 P.2d 1387 (1973). Véanse además los siguientes casos según relacionados en *The Bar Examiner's Handbook, op. cit.,* págs. 31–32: *Marshall* v. *Murphy,* Civil Action No. B-78-873 (D. Md. 9/11/79); *Durante* v. *Pringle,* Civil Action No. 75-M-1397 (D. Col. 1978); *Burge* v. *Committee of Bar Examiners of the State of California,* No. C 74 1010 SAW (N.D. Cal. 1974).

▬ Sexto, bajo este panorama, el debate forense e intervención judicial se centra en auscultar si la evaluación mide razonablemente en el presente la capacidad del aspirante. Así, un reclamo de vista ante el Estado está limitado a alegaciones serias de fraude, discriminación o coerción en el proceso evaluativo. *Hooban* v. *Board of Gov. of Wash. State Bar Ass'n,* supra, pág. 688; *Petition of Pacheco,* supra, pág. 1300; *Application of Peterson,* supra, pág. 307. Los aspirantes, sin embargo, no deben quedar en un estado de indefensión. Admitimos que la interposición de barreras inflexibles constituiría un trato opresivo. Comentario, *Review of Failing Bar Examination, op. cit.,* págs. 300–301.

III

▬ En consideración a la clase de examen brindado, objetivo o ensayo y discusión, y en aras de promover mayor imparcialidad, es razonable requerir al Estado que señale a los

aspirantes las materias en las que han fallado o no han demostrado poseer un mínimo de competencia. Así pueden tratar de subsanar las "deficiencias" para futuros intentos.(7) Debe permitirles que otros miembros del panel revisen el examen reprobado. También que se establezca algún mecanismo de revisión de los exámenes de aquellos que han fracasado para asegurarse que no se han cometido errores de cómputo. Massaro, O'Brien, *op. cit.*, pág. 307; *Tyler* v. *Vickery*, supra, pág. 1104; *Whitfield* v. *Illinois Board of Law Examiners*, supra, pág. 478. La meta de este micro-sistema adversativo —que incluiría, entre otros, la revisión de las preguntas y una comparación de los modelos de respuestas en pruebas de tipo ensayo o discusión— está predicada en la posibilidad de error significativo en el proceso de evaluación.(8) Véanse *Tyler* v. *Vickery*, supra, pág. 1104; *Poats* v. *Givan*, supra, pág. 499.

■ Ahora bien, en cuanto a pruebas objetivas de preguntas de selección múltiple o análogas, la situación y solución son distintas. De ordinario esas preguntas forman parte de un depósito al cual se recurre periódicamente. Por la naturaleza de las preguntas, se acepta que el margen de error es mínimo.

---

(7) Véase *Petition of Pacheco*, 514 P.2d 1297, 1300 (1973). Dicho remedio debe ser interpretado conforme a la totalidad de los principios esbozados en el caso de autos.

(8) Un autor ha sugerido que ese error, de ordinario, sería sumamente raro y sus posibilidades lejanas si se atienden las leyes de estadísticas. Explica así su pensamiento:

"En ausencia de prejuicio sistemático en el examen, los errores sólo serían la excepción. No es irracional (y probablemente conservador) sugerir que de cada cincuenta exámenes, sólo un examen —de otro modo aprobable— fracasaría por este tipo de error.

"La regla de estadística es que si la probabilidad de fracaso debido a error es una de cada x personas que toman el examen, i.c., $1/x$, la probabilidad de que esto le ocurra dos veces al mismo individuo es de $1/x^2$; que le ocurra tres veces, $1/x^3$. Por lo tanto, si $x=50$, la razón de error es de 2%; la razón de error al tomar el examen por segunda vez es de 0.04%; y al tomarlo por tercera vez es de 0.0008%." (Traducción nuestra.) Comentario, *Review of Failing Bar Examination: Does Reexamination Satisfy Due Process?*, 52 B.U.L. Rev. 286, 300–301 (1982).

Por ello, si las garantías del sistema interno adoptado en su preparación, corrección y demás extremos son razonables, un reclamo absoluto basado en que la única forma de un aspirante corroborar si hay o no errores en la clave utilizada por corrección (v.g. en la programación de una computadora), no es un remedio judicial favorecido.

En este sentido, frente al pedido y argumento de que un aspirante puede superarse y mejorar si se le brinda la oportunidad de confrontar sus contestaciones con la clave de respuestas, es oponible a la defensa válida de que la prueba diseñada es justa y ofrece garantías contra una evaluación errónea o arbitraria. El Estado no está obligado a entregar aquellas preguntas y respuestas que proyecte o razonablemente espere utilizar en futuros exámenes. ([9])

■ Existen diversas razones de peso justificativas de esta negativa. En primer lugar, se mermarían significativamente las fuentes si el Estado comúnmente facilitara a un aspirante las preguntas y contestaciones que corresponden a la categoría de objetivas (*multiple choice*) y son de carácter repetitivo. Se acepta que el costo de su confección es sustancial. Un estudio reciente informa que los gastos por cada ítem en pruebas relacionadas con el licenciamiento de personal paramédico asciende a cientos de dólares. Massaro, O'Brien, *op. cit.*, pág. 308, n. 203.

Bajo este razonamiento el Estado opone un interés financiero y pragmático que amerita ser balanceado. Lo contrario implicaría que vendría obligado a descartar esas preguntas, preparar un nuevo examen o revisarlo cada vez que lo adminis-

---

([9]) Cuando un aspirante cuestiona la validez de un examen sobre bases sustantivas, lo máximo concedido como remedio singular ha sido diseñar un mecanismo en que los materiales se han puesto a disposición de un perito —sujeto a órdenes protectoras de comprobada efectividad— para preservar la confidencialidad de los distintos ítems. Véanse *Martin* v. *Educational Testing Service, Inc.,* 431 A.2d 868, 874 (1981); *Application of Peterson,* 499 P.2d 304 (1972); *Petition of Pacheco,* supra.

tre. Ello, unido al costo de la recorrección, es un fuerte indicador de que constituiría un gasto prohibitivo y una carga onerosa. Massaro, O'Brien, *op. cit.*, págs. 308–309. Esto es, una reevaluación libre e ilimitada representaría un gravamen muy costoso para la sociedad. *Lavash* v. *Kountze*, supra, pág. 106; *Whitfield* v. *Illinois Board of Law Examiners*, supra, pág. 478; *Tyler* v. *Vickery*, supra, pág. 1105. De ahí que los tribunales no requieren al Estado que descubra rutinariamente las preguntas y respuestas que determine reutilizar en el futuro.

█ Segundo, esa solución confronta el serio riesgo de convertir a los tribunales en "superjuntas" inmersas en el complicado y especializado proceso de evaluación y calificación. En tales casos se estima que la mejor práctica es determinar si el proceso instituido para la revisión cumple con estándares mínimos de debido proceso de ley, conforme a las circunstancias particulares de la reglamentación envuelta. *Lavash* v. *Kountze*, supra, págs. 105–106; *Hooban* v. *Board of Gov. of Wash. State Bar Ass'n*, supra, págs. 689–690; *Whitfield* v. *Illinois Board of Law Examiners*, supra, págs. 477–478; *Poats* v. *Givan*, supra, pág. 497; *Bailey* v. *Board of Law Examiners of State of Tex.*, supra, pág. 109; *Muñoz* v. *Department of Registration and Ed.*, supra, pág. 1139; *Davidson* v. *State of Ga.*, supra, págs. 896–897.

Tercero, esa medida levanta delicados problemas en el área de la igual protección de las leyes. Con buen juicio se aduce la evidente desventaja que representaría para un aspirante inicial competir con aquellos que, más allá del momento del examen, tienen acceso previo a las preguntas y respuestas, por el solo hecho de haberlo reprobado. *Whitfield* v. *Illinois Board of Law Examiners*, supra, pág. 478; *Tyler* v. *Vickery*, supra, pág. 1105. Esto es, los situaría en posición privilegiada que rebasa la adquisición incidental de conocimientos basada en la memoria en ocasión del examen.

Finalmente, existe el grave peligro de que se relajen irreversiblemente los estándares de medición. Esta proposición no

es pura especulación. El caso de autos es ejemplarizante. Se trata de nueve (9) aspirantes. Razonablemente el abanico de contestaciones incorrectas es variado y amplio. Todo tiende a indicar que acceder a sus pretensiones, a corto plazo conllevaría descubrir y exponer preguntas y respuestas de carácter repetitivo sobre segmentos vitales de la reválida médica. Nada ni nadie podría impedirles que la información individual así obtenida fuera grupal y metódicamente acumulada, recopilada, compartida y circulada con el propósito legítimo de una mejor preparación. Tampoco que fuera divulgado a terceros aspirantes interesados. Es lo lógico y humano. Los resultados negativos no son difíciles de imaginar. El establecimiento de esa rutina, su natural extensión a otros aspirantes y su consabido efecto multiplicador incontrolable, a largo plazo anularía la confiabilidad y seriedad de la reválida para medir responsablemente preciados conocimientos del saber hipocrático sobre los cuales la sociedad exige excelencia profesional.

## IV

A la luz de los principios expuestos, concluimos que no existe una obligación constitucional per se del Estado suministrar a los aspirantes información ilimitada e irrestricta. Bajo las coordenadas jurídicas pertinentes, ponderado el balance de intereses y perjuicios de las partes e interés público envuelto, resolvemos que el Tribunal Examinador de Médicos no está compelido a entregar las contestaciones de la clave oficial solicitada por los aspirantes. La reglamentación([10]) del

---

([10]) En lo pertinente reza:

"7.2 Revisión de Exámenes

"Cualquier candidato tendrá derecho, si así lo solicita por escrito, a la revisión de su examen, a lo cual procederá el Tribunal en el más breve plazo.

"7.3 Notificaciones, Reclamaciones; Revisión

"Los resultados de los exámenes serán notificados a los candidatos dentro del período de tiempo más corto posible. Las reclamaciones sobre resultados de exámenes serán dirigidas al Tribunal dentro de los noventa días después de recibidos dichos resultados.

Tribunal Examinador, conjuntamente con el remedio provisto por el Tribunal Superior, satisfacen adecuadamente e in extenso ([11]) los criterios judiciales prevalecientes, ([12]) a tono con los derechos invocados.

Bajo la Regla de nuestro Reglamento, *se expedirá el auto y se dictará sentencia confirmatoria.*

---

"7.4 Procedimiento de Revisión

"a) Se revisarán los exámenes de aquellos candidatos que lo soliciten dentro de los 90 días a partir del recibo de la notificación de los resultados del examen.

"b) Se revisarán las claves del examen.

"c) Se localizarán las hojas de contestaciones de los que piden revisión.

"d) Se cotejarán las hojas de contestaciones con la clave, bien por el método visual, si son pocos los solicitantes, o por máquina computadora.

"e) La revisión se hará únicamente por miembros del Tribunal.

"f) Las preguntas del examen son privativas del Tribunal.

"g) La decisión del Tribunal será final.

"7.5 Destrucción de Documentos de más de 90 días

"Los documentos relativos a examen de reválida (Hoja de contestaciones y folletos de examen) se destruirán luego de pasados los 90 días requeridos para solicitar revisión. Únicamente se conservará una copia de la clave y una copia del examen de reválida, la cual estará bajo la custodia del Presidente del Tribunal Examinador de Médicos."

([11]) Si el remedio excede en algunos aspectos lo que mínimamente es exigido por la Constitución, es cuestión que rebasa los límites decisorios de este recurso. El Tribunal Examinador de Médicos no recurrió. En nuestra investigación no hemos podido confrontarnos con ningún caso o razonamiento persuasivo que respalde la proposición de que el organismo examinador viene obligado a suministrar un desglose de las calificaciones por materia. Un especialista en la materia ha sugerido que no es una buena práctica, y que en ocasiones, puede ser desorientador (*misleading*) para los aspirantes. S. P. Klein, *On Testing III. Reporting Bar Examination Results*, The Bar Examiner, Vol. 53, Núm. 2, May 1984, págs. 24–31.

([12]) Los estados deliberadamente pueden ser más rigurosos en las guías y normas que establezcan para sus juntas examinadoras. California, por ejemplo, aprobó una ley (*Government Code Sec. 12944*) que requiere que todo examen de reválida de una profesión sea validado apropiadamente. En este mismo sentido, otras jurisdicciones estatales continúan legislando para regular la administración de exámenes. Estas leyes son conocidas como *truth-in-testing acts*. National Conference of Bar Examiners, *Litigation Report*, Vol. II, Núm. 3, 1981, pág. 5.

En lo concerniente a Puerto Rico, corresponde a la Asamblea Legislativa estudiar la posibilidad de adoptar legislación para establecer uniformidad de normas en las distintas juntas y organismos examinadores de profesiones, ocupaciones y oficios existentes.

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Torres Rigual concurren en el resultado sin opinión.