555 P.2d 399

A. Curtis JONES, Jr., M.D., et al., Plaintiffs-Respondents, and Kenneth E. Droulard, M.D. and J. R. Farber, M.D., Plaintiff Intervenors-Respondents,

v.

STATE BOARD OF MEDICINE and Department of Health and Welfare of the State of Idaho, Defendant-Appellants, and Idaho Medical Association and Idaho Hospital Association, Defendant Intervenors-Appellants, and State of Idaho and Monroe G. Gollaher, Intervenor-Appellant.

No. 12093.

Supreme Court of Idaho.

Oct. 15, 1976.

Eugene C. Thomas, Sp. Asst. Atty. Gen., Moffatt, Thomas, Barrett & Blanton, Boise, for defendants appellants.

Paul S. Street, Moffatt, Thomas, Barrett & Blanton, Boise, for defendant intervenors-appellants.

Richard C. Fields, Moffatt, Thomas, Barrett & Blanton, Boise, for intervenor-appellant.

Paul S. Boyd, Boise, for plaintiffs-respondents.

Lloyd J. Webb, Webb, Pike, Burton & Carlson, Twin Falls, for plaintiff intervenors-respondents.

SHEPARD, Justice.

This is an appeal from a judgment which held the 1975 Hospital-Medical Liability Act unconstitutional. The action was brought for declaratory judgment by certain physicians and hospitals against the State Board of Medicine and the Idaho Department of Health and Welfare. We reverse and remand for further proceedings.

The Act in question, Title 39, Ch. 42, Idaho Code, was enacted as a result of an alleged "medical malpractice insurance crisis." Among other provisions it places limitations on the remedies and recovery of medical malpractice actions in Idaho against physicians and acute care health facilities licensed in the state. Therein a ceiling is set on recoverable damages for actions against physicians of $150,000 per claim and $300,000 per occurrence, I.C. § 39–4204. The Act also sets a ceiling on recoverable damages for actions against acute care hospitals of $150,000 per claim and $300,000 per occurrence or the amount of $10,000 multiplied by the total number of beds in the hospital, I.C. § 39–4205. The Act limits the grounds for malpractice actions to those of common law negligence and requires that recovery should be restricted to compensatory damages not satisfied from collateral sources, I.C. § 39–4210. We note parenthetically that the term "compensatory damages" is not defined by the Act and it is appellants' argument that such provision was only intended to exclude punitive damages. The Act also requires all physicians and hospitals in Idaho to obtain malpractice insurance as a condition of licensure, I.C. §§ 39–4206, 4208, 4209.

Plaintiff-respondents are licensed physicians and hospitals in Idaho who are alleged to be affected by the provisions of the Act. Respondents below alleged that because of the constitutional doubts raised as to various portions of the Act, they have been compelled to maintain malpractice insurance coverage in excess of the

specific liability limitations set forth in the Act. The cost of this seemingly unnecessary coverage, they contend, has necessarily had to be passed on to their patients. They also allege that uncertainty as to the validity of the limitations set forth in the Act has compounded a crisis in medical malpractice insurance as indicated by excessive insurance costs and a reluctance of insurers to offer coverage competitive or otherwise to health care providers. Accordingly, pursuant to I.C. § 10–1201 et seq., plaintiff-respondents sought to have their status and legal obligations under the Act resolved by declaratory judgment. They contended that the limitations found in I.C. §§ 39–4204, 4205 and 4210 are in violation of the due process and equal protection clauses of the Fourteenth Amendment and Art. I, §§ 2, 13 and 18 of the Idaho Constitution. They also sought invalidation of the conditions of licensure found in I.C. §§ 39–4206, 4208 and 4209.

Appellant-defendants are the State Board of Medicine and the Department of Health and Welfare who are charged with hospital and physician licensing and general health care regulation. I.C. § 54–1805, et seq., I.C. §§ 39–1303, 1305. In response to plaintiff-respondents' complaint, they admitted all allegations but denied the constitutional invalidity of the challenged limitations. The parties stipulated submission of the controversy on the merits and the only formal factual matter submitted was the affidavit of the Director of the Department of Insurance.

Below petitions to intervene were filed and admitted on behalf of the Idaho Medical Association and the Idaho Hospital Association. They are appellant-intervenors on this appeal. In addition, the American Trial Lawyers Association and the Idaho Trial Lawyers Association, the California Trial Lawyers Association, the Washington Trial Lawyers Association, the American Medical Association and the State Department of Insurance appear as amici curiae.

As to the due process and equal protection violations asserted by plaintiff-respondents below, the district court held that it would presume constitutionality and utilize the restrained view test stating that "the limitation of liability feature of the Act obviously bears a reasonable relationship to the objectives sought to be advanced by the Act itself, i. e., the availability of liability insurance." The district court, however, went on to hold that the ability of citizens to seek redress for a breach of duty is a fundamental right preserved by Art. I, § 18 of the Idaho Constitution, which the court said requires "a full and complete remedy for every injury of person." The district court reasoned:

> "In my opinion, Art. I, Section 18 of the Idaho Constitution prohibits the limitation of liability for injuries otherwise recoverable under a right or cause of action and recognized by the common law at least at the time of the adoption of the Idaho Constitution in 1890. The clause provides relief for 'every' injury. Particularly does this clause prohibit limitation of liability where no substitute procedure or remedy, judicial or administrative, is provided. * * *

> "By way of Section 18, the Idaho Constitution recognizes those common law causes of action as existing in 1890 as the ability of an individual to seek redress for a breach of a duty owed as a basic right. These basic rights must be preserved even in times of economic stress concerning a great segment of the public, otherwise the door would be open for the dissolution and diminution of these basic rights to the disinterest of the individual members of the public under the contention and allegation of general public necessity.

> "It is thus the conclusion of this Court that the limitation of liability feature of the Hospital-Medical Liability Act violates Art. I, Section 18 of the Idaho Constitution and is therefore unconstitutional."

The court further held that that portion of the Act requiring the acquisition of malpractice insurance as a condition of licensure of physicians and hospitals was also invalid. The district court made no holding regarding the constitutionality of I.C. § 39–4210 limiting malpractice action to common law negligence and recovery thereon to compensatory damages.

Here, appellants assign error to the holding of the lower court as it relates to Art. I, § 18, and all parties here have argued as to whether the Act violates the due process and equal protection guarantees of both the Idaho and federal constitutions. Therefore we review the issues pertaining to due process and equal protection. *See, Grayot v. Summers,* 75 Idaho 125, 269 P.2d 765 (1954); *Taggart v. Latah Co.,* 78 Idaho 99, 298 P.2d 979 (1956).

In addition, respondents and intervenors assert that the restricted liability provisions of the Act are in violation of Idaho Constitution Art. I, § 7 (right to trial by jury) and Art. II, § 1 and Art. V, § 13 (prohibition against legislative encroachment upon judicial functions). Those issues were not reached below and are not reached here.

## I.

■ At the outset we consider the assertion that the district court erred in its finding that that portion of the Act placing a limitation on damages recoverable in medical malpractice actions contravenes Art. I, § 18 of the Idaho Constitution. That section provides:

"Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and rights and justice shall be administered without sale, denial, delay or prejudice."

The holding of the trial court was predicated upon its opinion that by this provision the Idaho Constitution effectively adopted the common law as it existed in 1890 and thereby preserved the common law right of action for medical malprac-

tice. *See, Nelson v. Harrington,* 72 Wis. 591, 40 N.W. 228 (1888). It is argued that the rights to recovery for injury to person, property or character which existed at the time of the adoption of our constitution remain inviolate and, while the legislature may alter common law remedies and attach conditions precedent to the exercise of those common law rights, it must provide substitute procedures or remedies in lieu thereof or it cannot deny a remedy which existed at common law. *See Newlan v. State,* 96 Idaho 711, 535 P.2d 1348 (1975) (dissenting opinion). We hold that the trial court erred in its reasoning and its application of Art. I, § 18 of the Idaho Constitution.

■■ To adopt that argument would be to hold that the common law as of 1890 governs the health, welfare and safety of the citizens of this state and is unalterable without constitutional amendment. Nothing in Art. I, § 18 either explicitly or implicitly prohibits legislative modification of common law actions. Art. I, § 18 contains no reference whatsoever to the common law. The only adoption of the common law in this jurisdiction is found in Art. XXI, § 2 of the state constitution and I.C. § 73–116. Those provisions clearly contemplate the inherent power of the legislature to modify the common law with few exceptions. *See, State v. McCoy,* 94 Idaho 236, 486 P.2d 247 (1971) (dictum). In *Newlan v. State, supra,* it was held that while the 120-day notice requirement restricts the period in which a claim may be brought, such does not deny access to the courts.

Art. II, § 6 of the Colorado Constitution is identical to the Idaho Constitution, Art. I, § 18. In rejecting the contention that that constitutional language preserved all preexisting common law actions for injury to person or property, that court said in *Vogts v. Guerrette,* 142 Colo. 527, 351 P.2d 851 (1960):

"The common law of England was not adopted in the state of Colorado by our Constitution, as it was originally ap-

proved by the people, or by [any] subsequent constitutional enactment. The common law prevails in this state * * * by legislative enactment. It may be repealed without violating our Constitution, by our General Assembly at any time it chooses to do so. * * * The legislature may at any time by a legislative act repeal any part of the common law either expressly or by passage of an act inconsistent therewith on any particular subject." 351 P.2d at 855 (quoting *Colorado State Board of Pharmacy v. Hallett*, 296 P. 540, 541 [Colo. 1931]).

*See also, O'Quinn v. Walt Disney Productions Co.*, 177 Colo. 190, 493 P.2d 344 (1972); *Ward v. Kidd*, 87 Idaho 216, 392 P.2d 183 (1964).

II.

We turn now to the due process and equal protection arguments which were made below and which have been reargued on appeal. There is, however, a threshold issue necessary of resolution, i. e., what standard or standards of review are to be applied in our scrutiny of the legislation under the due process and equal protection categories of constitutional inquiry. The *single* test utilized by the trial court was whether or not the limitations on recovery bear "a reasonable relationship to the objective sought to be advanced by the Act." *See, Employment Security Agency v. Joint A School Dist. No. 151*, 88 Idaho 384, 400 P.2d 377 (1965). However convenient that analysis may be, it fails to consider the distinct standards with respect to questions of due process and equal protection which are continuing to emerge in the United States Supreme Court and which have been applied with some elaboration in recent decisions of this Court.

The opinions dealing with questions of due process and equal protection are admittedly ambiguous and fluctuate in response to changing attitudes respecting the judiciary's role in the examination of social and economic legislation. As one example we

have seen the highly interventionist attitude on the part of the United States Supreme Court funded upon what has been described as a concept of "substantive due process" give way to an extreme Holmesian abstention from inquiry into the economic implications of regulatory legislation. *See*, McCloskey, "Economic Due Process in the Supreme Court: An Exhumation and Reburial," 1962 Sup.Ct.Rev. 34. At the same time in the area of equal protection we have seen a constitutional provision described by Mr. Justice Holmes as "the last resort of constitutional arguments" reach an historic high water mark as a tool for attacking invidiously discriminatory classifications. *See*, Tussman and tenBrock, "The Equal Protection of the Laws," 37 Cal.L.Rev. 341 (1949); "Developments in the Law of Equal Protection," 82 Harv.L.Rev. 1067 (1969).

We deem it clear that the United States Supreme Court has departed from any consideration of the substantive aspects of due process as they were formerly applied in the early part of the century. *See, Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *Olsen v. Nebraska ex rel. Western Ref. & Bond Ass'n.*, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Idaho has seen a like departure from the substantive utilization of the due process provisions of our constitution. A possible exception is contained in *Berry v. Summers*, 76 Idaho 446, 283 P.2d 1093 (1955) and *Berry v. Koehler*, 84 Idaho 170, 369 P.2d 1010 (1961), in which the Court continues to hold that the due process clause of our state constitution, Art. I, § 13, protects the right to pursue a useful occupation. Nevertheless, we deem the differences between the standard applied under Idaho's due process clause and the standard applied under the federal due process clause to be negligible.

In *Nebbia* the United States Supreme Court retreated from consideration of the substantive aspects of due process indicat-

ing that the sole question of inquiry is to determine whether "the means selected * * * have a real and substantial relation to the objective sought to be attained." 291 U.S. at 525, 54 S.Ct. at 511. The rule has been restated in terms of whether the regulation is reasonable in relation to its subject and is adopted in the interest of the community. *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L. Ed. 703 (1937). *See also, Berry v. Koehler,* 84 Idaho 170, 369 P.2d 1010 (1961). See also the reference to that level of analysis by the term "rational basis test" in the opinion of Justice Stone, *U. S. v. Carolene Products,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). It is apparent that the practical effect of the application of that test of legislation is to substantially remove the courts from inquiry into the ends sought to be served by a legislative action.

 It is argued here that there remains one additional test of substantive due process which in essence suggests that in abolishing common law rights the legislature must provide a reasonable substitute for that which has been taken away. As later discussion will indicate, we do not agree and hold that the sole standard applicable to the due process provisions of the federal and state constitutions is whether the challenged law bears "a rational relationship to the preservation and promotion of the public welfare." *Berry v. Koehler, supra,* 84 Idaho at 177, 369 P.2d at 1014.

We turn now to the standards applicable to equal protection challenges under the opinions of this and the United States Supreme Court. This Court has recognized and followed the utilization of a two-tier examination. *Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974); *Newlan v. State, supra; Stucki v. Loveland,* 94 Idaho 621, 495 P.2d 571 (1972); *State v. Cantrell,* 94 Idaho 653, 496 P.2d 276 (1972). *But see, Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975). If the classification involves a fundamental right or a suspect classification such as race, the state bears a heavy burden to justify the classification by a compelling state interest. That has been termed the strict scrutiny test.

In other classifications, particularly in the areas of social welfare legislation, a restrained standard of review is applied. Such standard is set forth in *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961):

> "The constitutional safeguard [of equal protection] is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their law results in some inequality. A statutory discrimination will not be set aside if any statement of facts may be reasonably conceived to justify it."

*See also, Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), wherein it was stated:

> "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" (Quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S. Ct. 337, 55 L.Ed. 369 (1911).

 We deem it clear then that the scrutiny to be applied in the restrained view of an equal protection claim is similar to that applied to claims which are grounded in due process. They appear to be distinguished only by the fact that with respect to due process there must be a preliminary showing that the interest involved is a cognizable liberty or property interest. And, with respect to questions of equal protection, it must be shown that the statute under attack creates a discriminatory classification. As a result the trial court in the case at bar applied a single test in deciding equal protection and due process questions raised in the instant case.

However, the opinions of the United State Supreme Court in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), would seem to declare a new category of inquiry as to questions of equal protection. *See also, Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Glona v. American G & L Insurance Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); and *Weber v. Aetna C & S Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

As above noted, the Supreme Court in *Nebbia* enunciated a new standard for examination in response to questions posed in terms of due process. In *Reed*, the Court has apparently revived that standard, however, now clothed in principles of equal protection. Quoting from the long-neglected case of *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), the court in *Reed* stated:

> "The Equal Protection Clause of that amendment does, however, deny to the States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" 404 U. S. at 75–76, 92 S.Ct. at 254.

It is our opinion that this poses a different and higher standard than the traditional restrained analysis of equal protection. The standard set forth in *Reed* focuses upon the relationship between the subject legislation and the object or purpose to be served thereby. This new intermediate standard of equal protection review has been described as "means-focus" because it tests whether the legislative means substan-tially furthers some specifically identifiable legislative end. *See*, Gunther, "In Search of Evolving Doctrine on the Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1 (1972).

█ The "means scrutiny" test enunciated in *Reed* has been followed by recent decisions of this Court in which statutes of a blatantly discriminatory nature have been held to be unconstitutional as a denial of equal protection. *See, Thompson v. Hagan, supra*, invalidation of the Idaho automobile guest statute; *Messmer v. Ker*, 96 Idaho 75, 524 P.2d 536 (1974), invalidation of the airplane guest statute; *Harrigfeld v. District Court*, 95 Idaho 540, 511 P.2d 822 (1973), invalidation of statutory discrimination between males and females in designation of the age of majority; *Sterling H. Nelson & Sons, Inc. v. Bender*, 95 Idaho 813, 520 P.2d 860 (1974), invalidating different statutorily imposed weight limitations for haulers of processed versus unprocessed commodities. We deem it also clear that those opinions did not intend to replace the traditional restrained view standard of equal protection tests of legislation except in those special cases involving invidiously discriminatory classifications. It is enough to say at this juncture that with respect to certain statutes which create obviously discriminatory classifications this Court will examine the means by which those classifications are utilized and implemented in light of the asserted legislative purpose. However, the burden of showing the absence of a reasonable relationship under the means-focus test remains with the one who assails the classification. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 33 S.Ct. 337, 55 L.Ed. 369 (1911); *Munn v. Illinois*, 94 U.S. 113, 132, 24 L.Ed. 77 (1877).

### III.

We now examine the question of whether the provisions of the Act before us are in violation of the guarantees of due proc-

ess of law found in the Fourteenth Amendment of the United States Constitution and Art. I, § 13, of the Idaho Constitution. Respondents have contended that the Act constitutes a denial of due process in three respects: (1) It deprives respondents of their constitutional right to pursue a recognized profession; (2) it limits medical malpractice actions without a corresponding *quid pro quo*; and (3) the recovery provisions are arbitrary, without rational basis and against public policy.

Section 6 of the Act, I.C. § 39–4206, provides:

"Every acute care hospital and physician licensed to provide health care in this state shall, as a condition of securing and maintaining such licensure, unless the requirement therefore has been waived as provided in section [11 of this act], secure liability insurance underwriting the exposure to loss referred to in sections [4 and 5 of this act (the physician or hospital liability limitation sections)] and shall file an appropriate certificate of insurance as hereinafter provided, confirming the existence of such insurance with at least such limits of liability at all times during which licensure remains valid. * * *"

Additional sections specify the procedures for insurance certification, I.C. §§ 39–4208, 39–4209, and permit the Director of the Department of Insurance to waive liability insurance requirements "[u]pon a showing by any physician or acute care hospital of inability to comply with the liability insurance requirements of this act, despite reasonable and good faith efforts to do so." I.C. § 39–4211.

■ Respondents contend that those statutory requirements constitute an unreasonable limitation upon their constitutional right to pursue a recognized profession. *See, Berry v. Summers,* 76 Idaho 446, 283 P.2d 1093 (1955); *Berry v. Koehler,* 84 Idaho 170, 369 P.2d 1010 (1961); *State v. Smith,* 81 Idaho 103, 337 P.2d 938 (1959); *State v. Armstrong,* 38 Idaho 493, 225 P.

491 (1923). The principle of law set forth in the *Berry* cases was not intended to prohibit the state from pursuing its legitimate regulatory activities including the mandatory licensing of professional health care providers. Those opinions merely recognize that the pursuit of an occupation is a liberty and property interest to which the due process protections of the state and federal constitutions attach and may not be prohibited by the legislature unless necessary to protect the health, safety or welfare of the citizenry. This recognition does not impede the power of the legislature to regulate callings that are related to the public health so long as such regulations are not arbitrary or unreasonable.

■ The power to require doctors and hospitals to obtain licenses before practicing medicine or providing health care is clearly within the state's police power. Here such licenses are required to be conditioned upon obtaining medical malpractice insurance, a requirement not unlike that imposed prior to the issuance of motor vehicle registrations, I.C. § 49–232, nor unlike the bonds which are required as a condition of pursuing numerous trades and professions such as barber colleges, bank tellers, commodity buyers, pesticide applicators, court reporters, weighmasters, well drillers, outfitters and guides, checkscalers and cemetery maintenance commissions. *See,* I.C. §§ 54–507, 26–406; 22–1406, 22–2211, 1–1102; 71–403; 42–238; 36–5408; 38–1215; 27–114. We hold that such requirements of obtaining medical malpractice insurance as a condition to licensure bear a rational relationship to the health and welfare of the citizens of the state by providing protection to patients who may be injured as a result of medical malpractice and to this extent does not violate the guarantees of due process of law. *Cf. Pollock v. Methodist Hospital,* 392 F.Supp. 393 (D. C.La.1975).

■ It is also argued that legislation such as the Act in question here which abolishes a common law right without providing a reasonable substitute or *quid pro*

*quo* therefore is violative of due process. We note at the outset that such argument could have little value or application to the hospitals in this case. Their liability, and conversely the right to an action against a hospital, was not a creation of the common law; at least, certainly not the common law in existence in 1890. *See, Bell v. Presbytery of Boise,* 91 Idaho 374, 421 P. 2d 745 (1966). The idea that due process imposes a *quid pro quo* requirement seems to have resulted from dictum in *New York Central Railroad v. White,* 243 U.S. 188, 201, 37 S.Ct. 247, 61 L.Ed. 667 (1917). *See also, Lasky v. State Farm Insurance Co.,* 296 So.2d 9, 17 (Fla.1974), Opinion of the Justices, 113 N.H. 205, 304 A.2d 881, 885 (1973); *Pinnick v. Cleary,* 360 Mass 1, 271 N.E.2d 592, 605–607 (1971). However, it appears to have been nothing more than a make-weight argument. In *Pinnick* upon which other state cases have relied, the court at the outset stated:

"We intimate no opinion as to whether, and if so in what circumstances, the application of this test [*quid pro quo*] is constitutionally required." at 605, fn. 16.

Moreover, in *Montgomery v. Daniels,* 38 N.Y.2d 41, 378 N.Y.S.2d 1, 14, 340 N.E.2d 444, 453 (1975), the New York Court of Appeals indicating that a "serious question exists as to whether this 'adequate substitute test' is any test at all" analyzed the authority of *White* as follows:

"In *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77, the court had been unequivocal in its statement that: 'A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed the great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances.' In *Arizona Employers Liab. Cases,* 250 U.S. 400, 421, 39 S.Ct. 553, 556, 63 L.Ed. 1058 the court later repeated those principles in the following language: 'But [common-law taught rules] are no more than rules of law, deduced by the courts as reasonable and just, under the conditions of our civilization * * *. They are not placed, by the Fourteenth Amendment, beyond the reach of the state's power to alter them, as rules of future conduct and tests of responsibility, through legislation designed to promote the general welfare'. Finally, in *Silver v. Silver,* 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 [1929], the court in a further dictum appeared totally to have undercut its earlier dictum in the *White* case by citing 'the rule that the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object'."

We agree with this analysis that the United States Supreme Court in *White* did not intend to engraft upon the traditional due process test an additional standard when the challenged statute involves alteration of some prior existing common law doctrine.

It is additionally argued that the Act is unreasonable and arbitrary since there is no relation between the monetary limitations placed on a recovery and any particular injury which has resulted from medical malpractice. It is asserted that the limitation is clearly an arbitrary amount selected for no reason other than political convenience and has no relationship to any legitimate public interest. We do not necessarily agree. The question here is only whether there is a rational relationship to a legitimate legislative purpose.

The legislative purpose of the Act as set forth in I.C. § 39–4202 is:

"Declaration of Necessity and Purpose: * * * to assure that a liability

**870**

insurance market be available to \* \* \* physicians, and licensed hospitals \* \* \* and that the same be available at a reasonable cost, thus assuring the availability of such hospitals and physicians for the provision of care to persons of the state."

Therefore the appellants contend and argue that the recovery limitation served to create a stable insurance market with reasonable rates, thereby securing a climate for continuous health care services to the people of this state.

▮▮▮ Questions of due process arising in challenges to legislation ordinarily result in a minimal scrutiny test, and this Court and others have at times engaged in speculative inquiry in order to identify any conceivable rational relationship which would legitimatize the legislative action. Nevertheless, it is argued, and we agree, that there is considerable doubt if the purpose of the limitations as declared in the Act is in fact the true object of legislative· concern. Also, there is doubt as to the relationship between the challenged limitations and the legitimate public purposes that this Act may be said to serve. We therefore deem it prudent to refrain from a decision on the question of due process without the production of a more factually revealing evidentiary record. Since, as will appear, it is essential that this case be remanded for the determination of questions pertinent to the equal protection challenges, it is appropriate that both the equal protection and due process challenges be considered in light of a better factual record.

We emphasize, however, that the remand on the due process question is limited to the production of facts and we do not depart from what we have heretofore discussed and upheld as the traditional standard for consideration of questions of due process.

### IV.

We turn now to consideration of the argument that those portions of the Act limiting recovery in medical malpractice actions create a classification which is discriminatory and in violation of the equal protection clauses of the Fourteenth Amendment and Art. I, § 2 of the Idaho Constitution. The classification which is there created distinguishes between those who are damaged as a result of medical malpractice in amounts exceeding $150,000 as contrasted with others likewise damaged by medical malpractice but whose damages are less than $150,000. Thus, those who are damaged in excess of the statutory limitation are denied full recovery. The standard which is to be used for review here is largely determinative of whether this classification is invidiously discriminatory so as to be prohibited by the guarantees of equal protection.

▮▮▮ It is initially argued that the limitations upon recovery for medical malpractice infringe upon a fundamental right, thus necessitating the application of the "strict scrutiny test" standard. We disagree and deem it clear that the challenged classification is not "suspect" as that has been identified by the United States Supreme Court. *Newlan v. State, supra.* We also disagree with the assertion that such classification involves fundamental rights as contemplated by Art. I, § 18, of the Idaho Constitution.

▮▮▮ Rather, we believe that the standard to be applied in testing the classification created by the challenged legislation is one of lesser scrutiny. Appellants argue that the classification created by the legislation must be judged by the standard set forth in *McGowan v. Maryland, supra,* which broadly states that "a statutory discrimination will not be set aside if any state of facts *may be conceived* to justify it." (Emphasis supplied). *See also, Evans v. Idaho State Tax Commission,* 95 Idaho 54, 501 P.2d 1054 (1972). On the other hand, respondents assert that the classification created by the legislation must be tested by the standard of *Reed v. Reed, supra,* i. e., according to whether it "rests on some ground of difference having a fair and substantial relation to the object of the

legislation." *See also, Thompson v. Hagan, supra.* When the test set forth in *McGowan* has been utilized, the result has ordinarily been the removal of the court from any but the most cursory review of the challenged legislation. It invites courts to *conceive* purposes which would justify statutes. The validity or invalidity of discriminatory classifications may under that test depend solely upon the extent of the imagination of the reviewing court and/or its adherence to the theory of judicial restraint. *See, e. g., Goesaert v. Cleary,* 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948); *Kotch v. Board of River Port Pilots Commissioners,* 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). While we recognize and agree with the concept of judicial restraint as it cautions against substituting "judicial opinion of expediency for the will of the legislature," *Purity Extract & Tonic Co. v. Lynch,* 226 U.S. 192, 33 S.Ct. 44, 46, 57 L.Ed. 184 (1912), nevertheless, blind adherence and over-indulgence results in abdication of judicial responsibility. It is appellant's position in the case at bar that since the legislature has declared the purpose of the subject Act and since that declaration is said and presumed to be founded on a rational factually based legislative determination, this Court is foreclosed from additional inquiry into the Act. We disagree.

This Court has found it necessary to look beyond the minimal scrutiny test of *McGowen* in reviewing classifications alleged to be violative of equal protection. In so doing, we have relied upon the standard set forth in *F. S. Royster Guano Co. v. Virginia, supra,* as quoted in *Reed.* That test scrutinizes the *means* by which the challenged legislation is said to affect its articulated and otherwise legitimate purpose. *See, State v. Cantrell, supra; Evans v. Idaho State Tax Commission, supra,* upholding challenged legislation and *Kerr v. Dept. of Employment,* 97 Idaho 385, 545 P.2d 473 (1976); *Thompson v. Hagan, supra; Messmer v. Ker, supra; Harrigfeld v. District Court, supra;* and *Sterling H. Nelson & Sons v. Bender, supra,* where statutes have been overturned as violative of equal protection.

■ In the usual and ordinary case where a statutory classification is to be tested in the context of equal protection, judicial policy has been, and continues to be, that the legislation should be upheld so long as its actions can reasonably be said to promote the health, safety and welfare of the public. Nevertheless, where the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute, then a more stringent judicial inquiry is required beyond that mandated by *McGowen.* That common thread runs through all the cases in which the *Royster-Reed* test has been applied by this Court.

Here it is apparent from the face of the Act that a discriminatory classification is created based on the degree of injury and damage suffered as a result of medical malpractice. Rather obviously although the Act is said to be designed to insure continued health care to the citizens of Idaho it cannot do other than confer an advantage on doctors and hospitals at the expense of the more seriously injured and damaged persons. In the absence of any record we are without information as to the factual basis underlying the purported correlation between limitation of claimant recovery and the promotion of health care for the people of Idaho. We therefore deem it essential that the purposes of the Act and the relationship of the legislatively designed means to accomplish those purposes must be examined.

■ Does the statute reflect any reasonably conceived public purpose, and does the establishment of the classification have a fair and substantial relation to the achievement of the objective and purpose?

Since appellants have argued their case in terms of the *McGowen* standard, we are

unable to ascertain how the classification between various victims of malpractice relate to the asserted purpose of assuring medical care to the people of Idaho, notwithstanding the declaration found in I.C. § 39–4202. It is asserted, however, that because of the increasing number of medical malpractice claims premium rates for medical malpractice insurance have dramatically increased and that Idaho's heretofore principal medical malpractice insurance carrier has withdrawn any coverage of 500 of the state's 900 doctors. It is argued that by limiting the amount of recovery it was intended to create a more stable basis for prediction of malpractice losses and thereby encourage the entry into Idaho of new insurance carriers at lower, more reasonable and more competitive rates. We are unable to judge the accuracy or completeness of these assertions on the record presented here.

It is argued that the Act is a necessary legislative response to a "crisis in medical malpractice insurance" in Idaho, but the record does not demonstrate any such "crisis." Further, there is no evidentiary basis presented here to either support or refute the relationship between the limitations created by the Act and the abatement of the alleged crisis. As heretofore stated, the sole evidentiary record is found in the affidavit of the Director of the State Department of Insurance.

Although that affidavit is conclusory in stating that the Act was a "response to the medical malpractice insurance crisis" which crisis is indicated by increased premium rates and unavailability of insurance carriers, and that the Act was designed to stabilize the medical malpractice insurance market by providing a predictable level of recovery, other matters are contained therein which cast doubt on the validity of these conclusions. Simultaneous with the passage of the Act in question here, there was enacted additional legislation authorizing creation of a temporary joint underwriting association (JUA) of liability insurance carriers in the field of medical

malpractice insurance. Chapter 163, [1975] Idaho Sess.Laws 427. The formation of that association was contingent upon a finding by the Director of the Department of Insurance that medical malpractice insurance was unavailable under the standards of I.C. § 41–1405 in a voluntary market. I.C. § 41–4103(3). Attached to the affidavit of the Director of the Department of Insurance are the findings of the hearing held by him to consider the necessity of forming the underwriting association. Therein it is indicated that although two insurance carriers are withdrawing from the malpractice field in Idaho, seven remain, one of whom is offering to insure physicians left uninsured by the recent withdrawals. It is further found that the rates offered by the remaining companies "are based on *competent actuarial considerations* and appear to be adequate but not excessive or unfairly discriminatory." (Emphasis supplied) And, the Director concluded that it was thus unnecessary to activate the underwriting association stating:

> "Medical malpractice insurance, including coverage above $300,000, is available in Idaho under standards described in Section 41–4105 [41–1405], *Idaho Code,* for physicians in the voluntary market on a reasonably competitive basis."

In the affidavit those conclusions were extended to include hospitals as well as physicians. At the very least the findings of the Director resulting from that hearing present a differing and conflicting view of the alleged "crisis" upon which the Act is said to have been predicated.

■ The question was raised concerning the instability of the reinsurance market and its effect upon Idaho's primary carriers. It is apparent that reinsurance occupies a vital position for continued stability of medical malpractice insurance. U.S. Department of Health and Welfare Report to the Secretary's Commission on Medical Malpractice 39 (1973); Kendall and Haldy, "The Medical Malpractice In-

surance Market," Appendix to the Report, at 546–548. Nevertheless, the only record before us are the hearsay declarations of the Director of the Department of Insurance that he has been informed by one insurer that it had in turn been informed by its reinsurer that it could no longer contract reinsurance in amounts usually requested of the $1,000,000 excess policy. Such cannot be considered persuasive evidence of a general instability in the medical malpractice reinsurance market which affects Idaho's carriers. In the HEW Report, *supra,* it is indicated that the degree of influence that the reinsurance market exercises on the primary malpractice market depends directly upon the size of the primary insurance carriers. The report makes two additional findings of significance, i.e., that it is highly doubtful that any established carrier has not entered the malpractice field because of weakness in the reinsurance market and that to the extent medical malpractice insurance is available in the primary market, it is also available in the reinsurance market.

We would be remiss if we did not note the problems of the primary malpractice market vis-a-vis the reinsurance market which in the opinion of the Director of the Department of Insurance as set forth in his affidavit, are due to "extremely high losses" resulting from malpractice liability claims "combined with the abnormally low earnings from investments." We are troubled by the clear inference resulting therefrom that the "crisis" in response to which the subject Act was adopted results in part from economic fluctuations and resultant unsuccessful investment practices.

Attached to the original complaint in the case at bar is a statement allegedly presented to the legislature as an explanation of the need for the enactment of the subject legislation. It states in part:

"The rapidly increasing frequency and size of malpractice claims and judgments against physicians and hospitals nationwide, coupled with stock market reverses, have led to skyrocketing premiums for malpractice liability insurance and even potential inability to purchase such insurance."

Although appellants argue that such statements cannot be considered by this Court for any purpose, we disagree. I.R.C.P. 10(c); 2A Moore's Federal Practice, § 10.-06 (2d Ed., 1975); 5 Wright & Miller, § 1327 (1969); Barron & Holtzoff Federal Practice & Procedure, § 325 (1960) (superseded by Wright & Miller, *supra*). *See also, Simpson v. Southwest Railroad Co.,* 128 F.Supp. 532 (D.C.Ga.1955), affirmed on other grounds, 231 F.2d 59 (5th Cir. 1956), cert. denied, 352 U.S. 828, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956).

One further problem is posed by the affidavit of the Director of Insurance in determining the relationship between the means (restriction on claims) as related to the objective of the Act. Therein it is stated that the $150,000–300,000 limitation placed upon malpractice recoveries "would have covered all claims to date." The implication arising therefrom is that no judgment or settlement in a medical malpractice action in Idaho has to the knowledge of the Director exceeded the recovery limits of the Act.

In these regards the affidavit of the Director of the Department of Insurance sheds no light and provides no assistance to this Court, but rather as indicated, poses additional unsolved problems in our application of the test to the classification created by the Act and the challenge that such classification is violative of equal protection.

While we are as aware as any other member of the public of assertions of growing problems in the medical malpractice insurance field, the record here presents no factual basis for understanding the nature and scope of the alleged medical malpractice crisis nationally or in Idaho. It is thus impossible for this Court to assess the necessity for this legislation and whether or not the limitations on medical malpractice recovery set forth in the Act

bear a fair and substantial relationship to the asserted purpose of the Act.

Is there indeed a medical malpractice insurance crisis in Idaho? Are physicians and hospitals in Idaho being charged excessive, grossly unfair premiums for medical malpractice insurance (and if so, what is the position of the Director of the Department of Insurance of the State of Idaho in relation to duties imposed upon him, *See*, I.C. § 41–201 et. seq.), or are the monumental increases in medical malpractice insurance premiums reasonably attributable to the costs of doing business in the medical malpractice insurance field? Is medical malpractice insurance unavailable at reasonable rates in the absence of legislative enactments? Is the threat of unavailability of health care to the people of Idaho a reality or not? Has there been, as suggested, an increased rash of claims and sizable recoveries or settlements in favor of persons alleged to have suffered as the result of medical malpractice in Idaho? Finally and most importantly, if there is indeed a medical malpractice insurance crisis in Idaho, what is the effect or will be the effect of the limits of recovery and the other provisions of the subject Act with respect to forestalling or abating the crisis? In the absence of any factual information bearing on these questions, if indeed there are answers, no decision can be made by this Court in the area of the equal protection challenge to the Act.

In an effort to find some answer outside the parameters of the record in this case we have examined some of the growing body of literature on medical malpractice insurance. Therein we find general agreement that there is a growing problem in medical malpractice insurance which is manifested by increasing rates and a threat of curtailment of health care. Four dominant factors appear of prominent concern although the overall causes of the problem appear intricate, highly interrelated and difficult of ascertainment. The HEW Report, *supra,* at 24, attributes the root cause of medical malpractice problems to an increase in patient injuries. While those iatrogenic injuries (those induced during treatment) may or may not be caused by negligence, their numerical increase is a reality. The second causal factor is the increase in number of malpractice claims. We are aware of no statistics evidencing such an increase in number of claims in Idaho and on a national basis the statistics vary considerably. The Insurance Services Organization estimates nationally an increase in claims of 12%. In contrast, an estimate of 225% annual increase between 1970 and 1975 was made by St. Paul Fire & Marine Insurance Co. That same data, however, indicates a 130% increase between 1969 and 1974. Downey, "Medical Malpractice Bares Its Fangs at Hospitals, and Its Venom May Prove Deadly," Modern Health Care, 21–23 (June 1975). The HEW Report, *supra,* at 12, characterizes medical malpractice incidences as being "a relatively rare event" and suggests that claims are even more unusual. On the basis of 1970 data from 26 of the largest medical malpractice insurance carriers (representing 90% of the industry nationally) it is estimated that a malpractice incident was reported in one out of every 158,000 patient visits and a claim was made for only one of every 226,000 visits. Rudolph Myers and Mirabella, "Medical Malpractice Insurance Claims Files Closed in 1970," HEW Report, Appendix. This same report also indicates that fewer than one court trial was held for every ten claims closed in 1970. One commentator states that the number of claims made against physicians is not excessive given the actual number of serious medical errors which occur and the extent to which patients and their attorneys perceive meritorious grievances. Mechanic, "Some Social Aspects of the Medical Malpractice Dilemma," 1975 *Duke Law Journal* 1179.

A third factor exerting an effect upon medical malpractice insurance is the dollar amount of damages awarded in verdicts and the rise in that dollar amount in recent years. Downey, *supra,* at 27. The HEW Report, *supra,* at 33, found in 1970 that the median recovery was $3,000 and "less than

1% of all cases closed (in 1970) were for amounts in excess of $100,000." On the other hand, St. Paul Fire & Marine Insurance Co. reports that the average payment for malpractice claims nationally increased from $6,705 in 1969 to $12,535 in 1974. Congressional Quarterly 709 (April 5, 1975). Of large significance, of course, is that in 1970 medical malpractice insurance losses in Idaho (including expenses as well as actual awards and settlements) constituted less than one-tenth of 1% of the national total.

A final factor indicated by the literature has been the difficulty in providing medical malpractice insurance at reasonable rates. Rate-setting in medical malpractice insurance has been described as an "actuarial nightmare." Therein it is stated:

"The basic objective of any insurance company is to sell insurance at a rate which is competitive and which will result in a profit for the company. In order to do this companys employ actuaries to predict future losses that must be paid from present premiums. * * * Rates must produce a sufficient premium volume to (1) cover the losses that will occur during the period, (2) cover the administrative expenses of running the business, and (3) provide a small margin for the unknown contingencies, which may become a profit if not used." HEW Report, *supra,* at 41–42.

While the objective in setting medical malpractice insurance premiums may be stated simply, the actuarial principles utilized to develop those rates are complicated. The relatively small size of the market and the fluctuations in the number of claims and the size of the awards "have deprived the rate-maker of his basic ingredients for rate making-frequency and average claim cost." *See,* Roddis & Stewart, "The Insurance of Medical Loss," 1975 Duke Law Journal 1281. There is no method by which we can gauge the reasonableness of the means in limiting Idaho malpractice awards without some understanding of the actuarial problems facing insurers as they specifically and directly relate to Idaho. Parenthetically we note that a Detroit based group calling themselves the "Physicians Crisis Committee" has recently stated that the rate making of one of the major malpractice insurance carriers bears no relationship to actuarial principles or calculations. That company it is said has exploited the crisis in malpractice insurance by increasing its rates in such a way that its after tax earnings on investments were nearly 32% in 1975 as contrasted with 11% in 1965. "MD's say carrier makes 32% after tax profits," Medical World News 21 (May 3, 1976).

Perhaps the most vexing problem in malpractice rate setting nationally has been the protracted period of time that passes prior to the reporting and settlement of malpractice claims. *See,* HEW Report, *supra,* at 22; Comment, "Recent Medical Malpractice Legislation—A First Checkup," 50 Tulane Law Review 655 (1976); Comment, "The 'Claims Made' Dilemma in Professional Liability Insurance," 22 UCLA Law Review 925 (1975). What has been described as the "long tail" on malpractice losses is the period during which doctors and hospitals may be exposed to liability for iatrogenic injuries following actual patient contact. In part, this results from some statutes of limitations which may not begin to run until several years after the incident which caused the injury. As a result a claim may be far removed in time from the point at which the patient received the actual treatment. In Idaho this problem has been significantly restricted by I.C. § 5–219 which sets a limitation of court action for medical malpractice within two years "following the occurrence, act or omission complained of" or one year following "discovery" of a foreign object left in the body. *See, Billings v. Sister of Mercy of Idaho,* 86 Idaho 485, 389 P.2d 224 (1964); *Cook v. Soltman,* 96 Idaho 187, 525 P.2d 969 (1974); and further restricted by *Johnson v. Gorton,* 94 Idaho 595, 495 P.2d 1 (1972); *Stoner v. Carr,* 97 Idaho 641, 550 P.2d 259 (on rehearing) (1976); but see *Renner v. Edwards,* 93 Idaho 836, 475 P.2d 530 (1970);

*Johnson v. Stoddard,* 96 Idaho 230, 526 P.2d 835 (1974). In light of the above case law in Idaho it appears that the actuarial problem resulting from time lag may be less in Idaho than on a national scale.

In the case at bar the Act has been described by the appellants as a "local response to a national problem." The above discussed literature casts some light on the existence of a so-called "crisis" and some of the problems inherent in that crisis. The record before us contains no attempt to relate any findings of national scope to Idaho and this Court lacks the ability to extrapolate any such relation from the national literature. Since Idaho has only .5% of the general practitioners, .2% of the surgeons and .8% of the hospitals, all as contrasted with national totals, any limitation on the liability of physicians or hospitals in this state may have only the most remote effect upon a nationwide medical malpractice insurance crisis. *See,* Kendall & Haldey, *supra,* at 525–527.

It is necessary, therefore, that the case at bar be remanded to the district court for additional evidence, findings and conclusions consistent with this opinion. The respondents are not relieved from their burden to show the unconstitutionality of the assailed classifications contained in the legislation. *See, State v. O'Bryan,* 96 Idaho 548, 531 P.2d 1193 (1975); *Cummings v. J. R. Simplot Co.,* 95 Idaho 465, 511 P.2d 282 (1973); *Leonardson v. Moon,* 92 Idaho 796, 451 P.2d 542 (1969); *Idaho Telephone Co. v. Baird,* 91 Idaho 425, 423 P.2d 337 (1967).

### V.

Since the case at bar will be remanded, one further issue is necessary of discussion albeit such was not before the district court. Following disposition below but prior to consideration here, an opinion of the Illinois Supreme Court had under consideration that state's medical malpractice statute and declared it unconstitutional in aspects pertinent to the case at bar here. *Wright v. Central Dupage Hospital Assn.,* 63 Ill.2d 313, 347 N.E.2d 736 (1976). That Illinois Act contained a maximum lia-

bility recovery of $500,000 "on account of injuries by reason of medical, hospital or other healing art malpractice." That monetary limitation was found to violative of Art. IV, § 13, of the Illinois Constitution, prohibiting "special privilege" legislation. Art. III, § 19, of the Idaho Constitution provides in pertinent part:

> "The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any person or corporation in this state or any other municipal corporation therein. * * * "

The respondents-intervenors have argued that the recovery limitation in the Idaho. Malpractice Act is likewise unconstitutional as offensive to Art. III, § 19, of the Idaho Constitution.

That provision of the Idaho Constitution was patterned after those which occurred in many state constitutions in the late nineteenth century following a proliferation of special and local laws in post-Civil War legislatures. Clow & Marcus, "Special and Local Legislation," 24 Ky.Law Journal 351, 355–358 (1936). The general purpose of such constitutional provisions was "to prevent legislation bestowing favors on preferred groups or localities. *State ex rel. Idaho State Park Board v. City of Boise,* 95 Idaho 380, 383, 509 P.2d 1301, 1304 (1973).

It has been indicated that the distinction between general and special legislation is that a law is general if "all persons subject to it are treated alike as to privileges, protection and in every other respect." *Wanke v. Ziebarth Const. Co.,* 69 Idaho 64, 202 P.2d 384, 393 (1948). Stated in other terms, "A statute is general if its terms apply to, and its provisions operate upon, all persons and subject-matter in like situation[s]." *Jones v. Power County,* 27 Idaho 656, 150 P. 35, 37 (1915); *In re Bottjer,* 45 Idaho 168, 260 P. 1095 (1927). "It is well settled that a law is not special in character 'if all persons subject to it are treated alike, under similar circumstances

and conditions, in respect to both the privileges conferred and the liabilities imposed.'" *State v. Horn,* 27 Idaho 782, 793, 152 P. 275, 279 (1915). *See also, In re Crane,* 27 Idaho 671, 151 P. 1006 (1915); *Ada County v. Wright,* 60 Idaho 394, 92 P.2d 134 (1939); *State v. Lindstrom,* 68 Idaho 226, 191 P.2d 1009 (1948).

Clearly it is arguable at least that the Act in question here is special in that it selects from a class of persons otherwise subject to liability for their negligent acts, physicians and hospitals, and releases or extinguishes, in part at least, their otherwise liability contrary to the interdiction of special laws in Art. III, § 19. The limitations of Art. III, § 19, are not, however, absolute in their application.

In our constitution, local and special laws are prohibited only in regard to the matters therein specifically mentioned. *Butler v. City of Lewiston,* 11 Idaho 393, 83 P. 234 (1905); *State ex rel. Idaho Park Board v. City of Boise, supra.* In that fashion, our constitution differs from that of California in that Idaho's contains no catch-all restriction against special laws where a general law would apply. In California, the standard applicable to their special legislation clause is equated with that standard utilized under the equal protection clause of the federal constitution. *Los Angeles County v. Southern California Telephone Co.,* 32 Cal.2d 378, 196 P.2d 773 (Cal.1948), appeal dismissed, 336 U.S. 929, 69 S.Ct. 737, 93 L.Ed. 1090 (1949); *Carleson v. Superior Court for County of Sacramento,* 100 Cal.Rptr. 635 (Cal.App.1972); *Russell v. Carleson,* 36 Cal.App.3d 334, 111 Cal.Rptr. 497 (1973). *See also, McCarty v. Goldstein,* 151 Colo. 154, 376 P.2d 691 (1962); *People v. Sprengel,* 176 Colo. 277, 490 P.2d 65 (1971); Clow & Marcus, *supra.* We hold the equal protection clause of the federal constitution and Art. III, § 19, of the Idaho Constitution, were adopted to serve distinctly different identifiable purposes. While it might be constitutional in the sense of equal protection for our legislature to single out persons or corporations for preferred treatment, such would nevertheless be regarded as in conflict with Art. III, § 19. *See, Jackson v. Gallet,* 39 Idaho 382, 228 P. 1068 (1924); *State Water Conservation Board v. Enking,* 56 Idaho 722, 58 P.2d 779 (1936); *Wiggin v. City of Lewiston,* 8 Idaho 527, 69 P. 286 (1902); *Board of County Commissioners of Lemhi County v. Swensen,* 80 Idaho 198, 327 P.2d 361 (1958).

If as asserted by appellants here the Act in question is found to have been enacted in response to a problem of statewide concern in Idaho and by alleviation of that problem, it is found to serve the health and welfare of the people of the state of Idaho, and the means adopted in the Act are held to be reasonably related to the solution of those problems, then the Act will survive the challenge that it is offensive to Art. III, § 19, of the Idaho Constitution. Therefore, the challenges posed to the Act as offensive to Art. III, § 19, are likewise remanded to the district court for additional evidence, findings and conclusions by that court.

There is also remanded to the district court for its consideration the challenge to § 10 of the Act which limits the grounds for malpractice action to common law negligence and requires that recovery shall be restricted to compensation damages not satisfied from collateral sources. I.C. § 39–4210. Also to be considered by the trial court are those questions presented by the enactment of Chapter 278, [1976] Idaho Sess.Laws, p. 953, establishing panels for review of medical malpractice actions. *See, Wright v. Central Dupage Hospital Assn., supra.*

Judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion. No costs allowed.

McFADDEN, C. J., and BISTLINE, J., concur.

DONALDSON and BAKES, JJ., concur except as to Part I in which they concur in the result.